## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MELINA N. JACOBS, On Behalf of Herself and All Others Similarly Situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| VERIZON COMMUNICATIONS, INC.; VERIZON INVESTMENT MANAGEMENT CORP.; THE VERIZON EMPLOYEE BENEFITS COMMITTEE; MARC C. REED; MARTHA DELEHANTY; ANDREW H. NEBENS; CONNIA NELSON; SHANE SANDERS; ROBERT J. BARISH; DONNA C. CHIFFRILLER; FIDELITY MANAGEMENT TRUST COMPANY; AND FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, INC. | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff Melina N. Jacobs, individually and on behalf of all others similarly situated, brings this action on behalf of the Verizon Savings Plan for Management Employees (the "Plan"), against Defendants Verizon Communications Inc. ("Verizon"); Verizon Investment Management Corp. ("VIMCO"); The Verizon Employee Benefits Committee (the "VEBC"); Marc C. Reed, Martha Delehanty, Andrew H. Nebens, Connia Nelson, Shane Sanders, Robert J. Barish, and Donna C. Chiffriller, who are current or former individual members of the VEBC; Fidelity Management Trust Company; and Fidelity Investments Institutional Operations Company (collectively "Defendants," or for all Defendants except Fidelity, the "Verizon Defendants"), to recover financial losses suffered by the Verizon Plans and participants and

beneficiaries of the Verizon Plans and to obtain injunctive and other equitable relief in this action, pursuant to § 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a).

2.      Verizon is one of the largest companies in the world. According to Fortune Magazine, in 2015, Verizon was the fifteenth largest company in the United States and the forty-second largest company in the world as measured by annual revenue.[1]

3.      Verizon sponsors and maintains four participant-directed defined-contribution 401(k) retirement plans for the benefit of its employees:[2]

   a.   The Verizon Savings Plan for Management Employees;

   b.   The Verizon Savings & Security Plan for Mid-Atlantic Associates;

   c.   The Verizon Savings & Security Plan for New York & New England Associates; and

   d.   The Verizon Savings & Security Plan for West Region Hourly Employees.

The assets of all four of these plans, which are collectively referred to herein as "the Verizon Plans," more than thirty billion dollars as of December 31, 2014, are all invested through the Verizon Master Savings Trust (the "Master Trust").  This makes the Master Trust one of the largest private retirement trusts in the country.

---

[1] *See* Fortune Magazine, Fortune 500 2015, *available at* http://fortune.com/fortune500/verizon-15/ (last visited Feb. 2, 2016).

[2] A defined contribution plan is a type of retirement plan with individual accounts for each employee, funded regularly by employee contributions that are invested on their behalf. At retirement, the employee receives the balance of his or her account, adjusted for any investment gains or losses. A 401(k) plan is a type of defined contribution plan. In a defined contribution plan, the investment risk is borne by the individual employee on whose behalf the funds in the account are invested. *See* Dept. of Labor, *Types of Retirement Plans*, *available at* http://www.dol.gov/general/topic/retirement/typesofplans (last visited Feb. 2, 2016).

4.     Verizon also sponsors defined-benefit pension plans for the benefit of its employees and retirees (and those of its corporate predecessors), with assets of more than twenty-three billion dollars. These defined-benefit pension plan assets are invested through the Bell Atlantic Master Trust.[3]

5.     All of the assets of the Master Trust and the Bell Atlantic Master Trust are under the management and control of VIMCO, a wholly-owned subsidiary of Verizon organized in 2000 for the purpose of managing the investment of the assets of the Verizon employee benefit plans. According to Bloomberg Business, VIMCO has more than sixty-six billion dollars in assets under management.

6.     If the defined-benefit and defined-contribution plans offered by Verizon were considered as a single pension fund, the Verizon Plans' assets would constitute one of the twelve largest private pension funds in the world.[4]

7.     Verizon hired a professional staff to manage its employees' retirement assets, and therefore has and at all material times had a fiduciary duty under ERISA to participants in the Verizon Plans. Accordingly, Verizon's sole responsibility was to properly manage the investment of Verizon employees' retirement plan assets—and with sixty-six billion dollars to invest, Verizon and the other Defendants had a duty to ensure that the investment choices offered to Verizon employees saving for retirement would be suitable for investment by retirement

---

[3] A defined benefit plan is a type of retirement plan that provides a fixed, pre-established benefit for employees at retirement. Employers are responsible for funding the plan and therefore the investment risk in a defined benefit plan is borne by the employer rather than the employees. *Id.*

[4] *See* Towers Watson, Pension & Investments/Towers Watson 300 Analysis 2014, *available at* https://www.towerswatson.com/en-US/Insights/IC-Types/Survey-Research-Results/2014/09/The-worlds-300-largest-pension-funds-year-end-2013 (last visited Feb. 2, 2016).

investors both in terms of the performance of those investments and the expenses associated with them.

8.      As specified in the Verizon publication *Your Investment Options in the Verizon Savings Plan* (the "Investment Guide"),[5] Verizon designed the Verizon Plans to give Plan participants control over the investment of their individual accounts in the Verizon Plans.[6] ERISA section 404(c) provides that if participants are given effective control over the investment of their accounts, neither Verizon nor VIMCO would be liable to participants for investment losses that resulted from the participant's selection of the Verizon Plans' available investment choices.  Regulations issued by the Employee Benefit Security Administration ("EBSA") of the U.S. Department of Labor ("DOL") describe in detail the conditions that must be satisfied in order to give participants control over the investment of their accounts.  Those conditions require that participants have available a wide range of appropriately-selected investment alternatives and be provided sufficiently detailed information about investment choices and investment-related expenses, as well as the rights, restrictions and costs associated with the management of their accounts, to make informed decisions about investment.

> It is the view of the Department that plan fiduciaries must take steps to ensure that participants and beneficiaries are made aware of their rights and responsibilities with respect to managing their individual plan accounts and are provided sufficient information regarding the plan, including its fees and expenses, and designated investment alternatives, including fees and expenses attendant thereto, to make informed decisions about the management of their individual accounts.

9.      Of course, to do that, the investment lineup must be designed and constructed so that the average plan participant will be able to understand enough about each of the investment alternatives and the relationship among those alternatives to be able to construct a balanced and

---

[5] Verizon, *Your Investment Options in the Verizon Savings Plan* (Feb. 1, 2015) [hereinafter "*Investment Guide*"].  The *Investment Guide* is attached hereto in its entirety as **Exhibit 1**.

[6] *Investment Guide, p.1, fn. 1.*

diversified portfolio comprised of the major asset classes available in the marketplace. The essence of Plaintiff's claim is that the Verizon Defendants designed an investment structure for the Verizon Plans that was overly complex, overly risky, and inappropriate for the average Verizon employee. The design was so complicated and layered with fees that it could not and was not effectively communicated to employees. The inappropriate nature of the investments and the excessiveness of the fees associated with the Verizon Plans' investments are inexcusable, and violated the Verizon Defendants' fiduciary duties under ERISA.

10.     In addition to the excessive risk and redundant layers of fees to which participants were subjected, both the Verizon Defendants and Fidelity failed in their separate fiduciary obligation to disclose to participants sufficient information to enable them to effectively manage their accounts and exercise their rights under the Verizon Plans and ERISA, robbing participants of the opportunity to manage their retirement accounts effectively.

11.     There are some generally accepted best practices in the design of an investment lineup for participant-directed 401(k) plans like the Plan and the other Verizon 401(k) plans. For example, Callan Associates, one of the country's most prominent investment consultants for 401(k) plans, recommends an investment choice design that includes at least two "tiers" of investment choices. An example of these tiers would be:

> a. One Tier includes offer an appropriate array of low-cost investment choices designed to provide an adequate set of building blocks that will allow Plan participants to create diversified portfolios over a broad range of risk and return combinations. These core investment choices will include the major asset classes (including stable value, fixed income, small and large capitalization domestic equity and international equity).

5

b.  Another Tier offers a series of time-based asset allocation investment choices designed for Plan participants who do not wish to create their own asset allocation from the core choices or to rebalance their accounts through time. The investment manager of these investment choices will adjust the level of risk through changes in the underlying asset allocation, these changes will occur as time passes.  The risk profile of these investment choices will get more conservative as the target date approaches.

12.  Verizon did not follow this practice or even a modified version of it. Instead, Verizon created a multi-dimensional labyrinth of actively-managed "custom" investment choices, each with multiple layers of investment management for which there is very little publicly-available information, and for which there are undisclosed and undiscoverable layers of fees that are nearly impossible for participants in Verizon's retirement plans to understand or evaluate.  Each of these designated investment alternatives (the "Verizon Custom Funds") is effectively a fund-of-funds.[7]  For example, the "Large Company Fund" is a pool of assets that are divided among seven different other funds.  The "U.S. Small Company Fund" allocates its assets equally among six different asset managers. The International Company Fund is invested in seven underlying funds.  VIMCO selected each of those underlying funds and determined the percentage of each fund would that be allocated to each manager.

13.  Although the Investment Guide identifies each of the underlying funds that comprise each of the Plan's investment choices, it provides no information about the investment

---

[7] A fund-of-funds is an investment fund that invests entirely in other investment funds. The fund-of-funds, then, has privileges with respect to this group of other mutual funds that it owns; *e.g.,* the fund-of-funds and (investors in it) have an interest in this group of securities based on the value thereof. Put most simply, when the mutual funds owned by the fund-of-funds rise in value, so, in turn, does the fund-of-funds.

strategy or the composition of the fund.  For most of these underlying funds, even a resourceful and knowledgeable Plan participant could not easily discover any other useful information about these underlying funds.  EBSA regulations required Verizon to provide each participant with specific plan-related and investment-related information sufficient to allow participants to make informed decisions regarding the management of their accounts.  29 CFR § 2550.404a-5.  The very design of the Verizon Plans' menu of investment choices ordained the failure of that obligation.  An investment design that cannot be meaningfully understood by the average Plan participant cannot be effectively managed by the average Plan participant.  As a result, the Plaintiff and all the members of the proposed Plan Class defined below have been deprived of the opportunity to manage their Plan accounts effectively.

14.    The flaws in the construction of the Verizon Plans' investment menu notwithstanding, VIMCO added a second layer of investment management fees with the creation of the custom Verizon Target Date Funds ("Verizon TDFs"), which are a type of asset allocation funds.  An asset allocation fund is a portfolio which consists of a diverse set of asset classes such as equities, bonds, and international securities, designed to achieve a certain level of risk and expected return, and may be structured as a "fund-of-funds" or invest directly in securities representative of the asset classes.

15.    TDFs are designed to allow retirement plan participants to invest in a single fund with a professionally-managed and broadly-diversified portfolio that becomes more conservative as the participant approaches retirement age.  The investment strategy of each fund is based on a level of risk generally deemed appropriate for someone who expects to retire in the year of the fund's target date. The investment strategy assumes greater risk in the fund's early years and grows more conservative over time. For example, in the early years when investors have more

time to bear short-term fluctuations in the stock market, each fund's asset allocation favors stocks to try to maximize returns. Then as the "target date" nears, money is gradually moved out of stocks and into more conservative investments, like bonds, to try to preserve the accumulated value of investors' accounts.  Typically, there will be multiple TDFs for the different retirement targets of a given organization, such as the 2020 Fund, the 2030 Fund, and the 2040 Fund. Collectively these TDFs are sometimes referred to as a "series." TDFs are primarily designed for participants who want a dynamic but consistently conservative asset allocation that matches their retirement timeline, and are designed to be a "set it and forget it" investment option for participants who want their investments to be appropriately balanced and managed until they expect to retire.

16.     Moreover, plans that include TDFs invariably designate the target date series as the plan's designated default investment alternative, as did the Verizon Plans.   A "qualified default investment alternative" ("QDIA") is the investment choice designated by the Verizon Plans for the accounts of those participants who fail to affirmatively provide investment direction for their account.   Simply put, the QDIA becomes the investment "choice" for participants.

17.     The risk profile of each fund in the Verizon TDF series is managed by allocating assets of each TDF in varying percentages among the Verizon Custom Funds, which are designated investment alternatives (investment choices) for the Verizon Plans, and among four other custom funds, listed below, that are not otherwise available as investment choices in the Verizon Plans.   In 2012, VIMCO added four additional underlying funds (the "Alternative Funds") to the asset allocation mix for the TDFs, but made a determination that they would not

be available to participants as independent investment choices except through investment in a TDF:[8]

      a.   A commodities fund (allocated among four other managers);

      b.   A global equity with active overlay fund (allocated among five other managers);

      c.   A global listed infrastructure fund (allocated among three other managers); and

      d.   A global high yield bond fund (allocated among three other managers).

18.    Each of these "alternative" or "specialty" asset classes or sectors added significant levels of risk and complexity to the Verizon TDF series.  The manager of one of the few underlying funds in which the Alternative Funds are invested for which there is any publicly available information, CoreCommodity Management LLC Diversified I, cautions that: "investment in Commodity-Related Equities . . . may subject the Fund to significantly greater volatility than investments in traditional securities and involve substantial risks, including a significant portion on their principal value."[9]

19.    The Investment Guide, in describing the Global Equity with Active Currency strategy states: "Non-U.S. markets and currency markets can be volatile.  Combining active currency with U.S. and non-U.S. equity can result in substantially more volatility within a portfolio."  *Investment Guide* at 13.

---

[8] Note that these are not "funds" in the traditional sense, they are simply models of asset allocation used in the TDFs.

[9] CoreCommodity Mgmt., *available at*  https://corecommodityllc.com/MutualFunds.aspx (last visited Feb. 4, 2016).

20.     The Investment Guide discussion of the Global High Yield Bond warns that "[g]reater risk, such as increased volatility, limited liquidity, prepayment, non-payment and increased default risk, is inherent in portfolios that invest in high yield ("junk") bonds or mortgage-backed securities, especially mortgage backed securities with exposure to sub-prime mortgages." *Investment Guide* at 13.  The Investment Guide also failed to mention the increased volatility associated with non-U.S. investment.

21.     Each of these four funds would be inappropriate to offer to Verizon's average plan participant as an available investment choice precisely because they represent focused investments in narrow sectors typically eligible for investment only by wealthy and sophisticated investors who can afford the additional risks presented by the investment strategy.[10]  Indeed, Verizon and VIMCO seem to agree with that restriction because the Alternative Funds are not available for direct investment by participants.  Yet they have been included in significant percentages in the TDFs which, by their very nature, are designed for investors who are neither wealthy enough nor sophisticated enough investors to be considered accredited within the meaning of the IRS' regulations.  Further, those investors have necessarily chosen not to create an asset allocation for their account even from those Verizon Custom Funds that might be considered "traditional" investment choices.

22.     Having created an investment design that was impossible for the average participant to fully comprehend, VIMCO made it even more difficult for participants to be able to evaluate the relative performance of the Verizon Plans' investment choices.  Effectively further obfuscating an already-opaque investment management and fee structure, VIMCO

---

[10] These investors are referred by the IRS as "accredited" investors who have more than $200,000 in annual income and/or more than $1,000,000 in net worth. SEC, *Investor Bulletin: Accredited Investors, available at* https://www.sec.gov/investor/alerts/ib_accreditedinvestors.pdf  (last visited Feb. 2, 2016).

created custom benchmarks with which to compare the performance of the Verizon Custom Funds and TDFs.   The custom benchmarks for the TDFs in particular, however, were designed to mimic the exact asset allocation of each of the Verizon TDFs to which they corresponded. As a result, all that the benchmarks actually measured was how another fund would have performed if it had been invested in the same asset classes and in the same proportion as the Verizon Plan in question.   The use of these custom benchmarks for the custom funds is misleading and violates 29 CFR § 2550.404a-5, which requires the disclosure to retirement plan participants of an appropriate investment benchmark.

23.   Active retirement plan asset management involves substantial investing risk.  As described in the Investment Guide, ""Active" management means that a portfolio manager is actively managing the investments to try to outperform the market in general.  Whatever the market does, as measured by certain benchmarks, the manager will try to do better and increase value for investors."  Active management involves risks arising from both manager selection and from the particular manager's selection of particular securities.  "Trying to do better" than the average performance of the market in general comes at a cost of additional risk in that active managers may need to make unconventional or divergent investment choices in order to beat the average.   From a risk perspective, the Verizon Plans' investment choices therefore fall on the riskier side of 401(k) plan asset management.

24.   Ironically, while Verizon was subjecting the savings of its employees in its defined-contribution plans (*i.e.,* the plans where the participants bear the investment risk) to the aforementioned additional risks and the high fees that go along with those risks, Verizon was significantly reducing its own risks with respect to its defined-benefit pension obligations and "de-risking" its pension plans by purchasing an annuity contact from Prudential. In fact, Verizon

was so concerned about its own retirement plan-related risk exposure—that is, the risk that VIMCO would not be sufficiently skilled to invest Verizon's pension assets to satisfy its pension obligations—that it spent nearly $8.4 billion dollars to eliminate $7.4 billion dollars in pension liabilities. *See Lee v. Verizon Communic'ns*, 954 F. Supp. 2d 486 (N.D. Tex. 2013). In other words, Verizon was willing to spend $1 billion dollars in order to ensure that Prudential would assume Verizon's investment risk with respect to $7.4 billion in plan assets—an investment risk that had previously been assigned to VIMCO. In the case of defined-contribution participants' retirement assets, however, Verizon's judgment has been that the investment risk (which, again, is borne entirely by the participants) is safely in the hands of VIMCO.

25.     At the same time that Verizon and VIMCO were de-risking the pension, VIMCO was actually increasing the level of risk in the Verizon Plans's TDFs (as described below) by adding the four Alternative Funds.

26.     Notwithstanding the aforementioned additional level of risk and the high fees charged for active management, the TDFs consistently underperformed their peer group of funds, often by 200 basis points[11] (two percent) or more.

27.     Underperformance of a plan's investment choices, and/or the charging of excessive fees can have a cataclysmic effect on the accumulation of an individual's retirement savings. A difference of only 30 basis points can be significant. Consider an investment of $1,000 over 30 years that earns 6.5%. This investment would have grown to nearly $6,600. If the same investment only earned 6.2%, the final value would only be $6,050, or 8% less. An 8% difference translates into one full extra monthly payment each year (1/12 = 8%). It is the

---

[11] The term "basis point" means one hundredth of one percent, or 0.01%. This term sometimes is abbreviated as "BPs," and is pronounced "bips." This is a standard term used in finance and the insurance industry. *See* Investopedia, *What is a basis point?*, http://www.investopedia.com/ask/answers/05/basispoint.asp (last visited Feb. 2, 2016).

difference, to a participant, of receiving 12 payments per year or 11 payments. A return that is 30 basis points lower eliminates an entire month of retirement income when a participant is living off accumulated retirement savings.

28.     Verizon's apparent lack of confidence in VIMCO may well have been justified in other ways. In at least one specific circumstance with respect to the Verizon Plans' investment choices, the Global Opportunity Fund, VIMCO has demonstrated a remarkable lack of oversight and discipline in monitoring the performance of the managers it has selected, and has tolerated year after year of subpar returns.

29.     As set forth in detail below, the risks to which Verizon defined-contribution retirement plan participant accounts were subjected were and are unreasonable, excessive and contrary to Verizon's own judgment with respect to similar risks arising from its defined-benefit retirement obligations. Furthermore, the associated fees and expenses paid by the Verizon Plans and participants were also unreasonable and excessive and, in many cases, not fully disclosed to participants and were not incurred solely for the benefit of the Verizon Plans and their participants.

30.     By subjecting the Verizon Plans and their participants to these excessive risks, fees and expenses, and by other conduct set forth below, the Defendants violated their fiduciary obligations under ERISA.

## JURISDICTION AND VENUE

31.     Plaintiff brings this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2), 1132(a)(3). This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

32.    Relief is appropriate under 28 U.S.C. §§ 2201 and 2202, which grant any district court of the United States, in a case of actual controversy within its jurisdiction, the power to declare the rights and other legal relations of any interested party seeking such declaration and to grant further necessary or proper relief based upon a declaratory judgment or decree.

33.    Venue of this action lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2) because Verizon maintains its principal place of business in New York, New York.

## PARTIES

34.    Currently, and during the class period (defined below), Plaintiff Melina Jacobs has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Plan.  During the period of her participation in the Plan, her account has been invested in the Verizon 2040 TDF, the Emerging Markets Fund, the Conservative Fixed Income Fund, and the Verizon Company Stock Fund. Jacobs resides in Milpitas, California.

35.    At all relevant times, the Verizon Plans were an employee pension benefit plans within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and an individual account plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

36.    Defendant Verizon is a Delaware corporation doing business within this District.

37.    Defendant VEBC and/or its chairperson is, pursuant to ERISA Sections 3(21) and 3(16), 29 U.S.C. §§ 1002(21) and 1002(16), the named "fiduciary" and "administrator" of the Verizon Plans. The VEBC has delegated day-to-day administration of Verizon's employee benefit plans to Verizon's human resources department. The VEBC is a body appointed by Verizon, and, as a body, performs certain designated fiduciary and administrative functions under Verizon's employee benefit plans. For example, as administrator and fiduciary of the

Verizon Plans, VEBC has the discretionary authority to exercise control over disbursements of assets in the Verizon Plans.

38.     Defendant VIMCO is, pursuant to ERISA Sections 3(21), 29 U.S.C. §§ 1002(21), a fiduciary of Verizon's several employee pension benefit plans, including the Verizon Plans. VIMCO exercises discretionary authority and control respecting management and disposition of the assets of the Verizon Management Pension Plan and Verizon's Master Trust and the Bell Atlantic Master Trust under which the assets are held. VIMCO has been delegated discretionary authority and appointed Plan Fiduciary by Verizon and has primary responsibility for the selection and monitoring of the investment choices for the Verizon Plans and the monitoring and supervision of all investment managers appointed by VIMCO to manage any part of the Verizon Plans' assets.

39.     Fidelity Management Trust Company ("FMTC") is a Massachusetts corporation with its headquarters in Boston, Massachusetts, and serves as the trustee and recordkeeper for the Plan.  FMTC is a trust company and manages assets for over 500 institutional clients worldwide, with more than $175.5 billion in trusts and other assets under management as of June 30, 2012. FMTC is a wholly-owned subsidiary of FMR LLC, the trade name of Fidelity Investments.  As trustee, FMTC is, by definition, a fiduciary to the Verizon Plans.

40.     Fidelity Investments Institutional Operations Company, Inc. ("FIIOC") is an affiliate of FMTC.  FIIOC provides trust services, recordkeeping and information management services for employee benefit plans and received indirect compensation from other service providers to the Plan in connection the services FIIOC provides to FMTC and indirectly to the Plan.  FIIOC serves as an agent to FMTC and is located in Boston, Massachusetts.

15

**Participant-Directed Defined-Contribution**
**Individual Account Plans**

41.     As recognized by EBSA of the DOL, more and more employees are investing for

retirement through participant-directed, defined-contribution individual account plans, known as

401(k) plans. Employees who participate in 401(k) plans assume responsibility for their

retirement income by contributing part of their salary in such plans and, in many instances, by

directing their own investments. These plans provide an opportunity for employees to save their

own pre-tax dollars in individual accounts and to benefit from additional contributions through

which their employer can "match" employee contributions.

Disclosure Obligations

42.     Fiduciaries of 401(k) plans, like the Defendants here, have an affirmative

obligation to provide participants with meaningful information about their rights under the plan.

As stated by the EBSA in the preamble to its regulation addressing Fiduciary Requirements for

Disclosure in Participant-Directed Individual Account Plans:

> With the proliferation of these plans, which afford participants and
> beneficiaries the opportunity to direct the investment of all or a portion of the
> assets held in their individual plan accounts, participants and beneficiaries are
> increasingly responsible for making their own retirement savings decisions.
> This increased responsibility has led to a growing concern that participants
> and beneficiaries may not have access to, or if accessible, may not be
> considering information critical to making informed decisions about the
> management of their accounts, particularly information on investment choices,
> including attendant fees and expenses.
>
> *       *       *
>
> [I]t is the view of the Department that plan fiduciaries must take steps to
> ensure that participants and beneficiaries are made aware of their rights and
> responsibilities with respect to managing their individual plan accounts and
> are provided sufficient information regarding the plan, including its fees and
> expenses, and designated investment alternatives, including fees and expenses

attendant thereto, to make informed decisions about the management of their individual accounts.[12]

43.     As required by 29 CFR § 2550.404a-5, each participant must be provided with the following information for each designated investment alternative under the plan:

    a.   The name of the designated investment alternative;

    b.   The type or category of the investment (*e.g.*, money market fund, balanced fund, large-cap fund, etc.);

    c.   If the designated investment alternative's return is not fixed;

    d.   the average total return, for the 1-year, 5-year, and 10-year periods (or for the life of the alternative, if shorter) ending on the date of the most recently completed calendar year;

    e.   the name and returns of an appropriate broad-based securities market index over the same 1-year, 5-year, and 10-year periods (or for the life of the alternative, if shorter);[13]

    f.   the amount and description of any "shareholder-type fee," such as sales loads and charges, and redemption or surrender fees, charged directly against a participant's investment and not included in the total annual operating expenses of any designated investment alternative;

    g.   total annual operating expenses of the investment, expressed as a percentage, (previously, 404(c) required disclosure only upon request); and

---

[12] 75 Fed. Reg. 64910 (October 20, 2010).

[13] Such a benchmark index cannot be administered by an affiliate of the investment issuer, its investment adviser, or a principal underwriter, unless the index is widely recognized and used.

h. total annual operating expenses for a one-year period expressed as a dollar amount for a $1,000 investment (assuming no returns and based on the percentage in (g) above).

44. This regulation is designed to ensure that, with respect to 401(k) plan participants' investment choices, participants know the nature of the investment they are choosing, the risks attendant to the investment, and how much they are paying for what they are getting.

45. This regulation is also part of a larger effort by the DOL to ensure that all fees and expenses charged either directly or indirectly to participant accounts are fully disclosed to investors and/or to responsible plan fiduciaries who are, in turn, obligated to ensure that 401(k) plans and their investors are not paying more than reasonable compensation for the services provided. Accordingly, the DOL issued regulations requiring enhanced disclosures by 401(k) plan service providers in connection with the annual report required to be filed on Form 5500. These enhanced reporting requirements require every service provider receiving more than $5,000 in direct or indirect compensation to report all such compensation to the plan sponsor. 29 CFR § 104a-5.

46. The regulation and the related instructions for filing the Annual Return of an employee benefit plan on Form 5500 define indirect compensation as compensation that is received by the service provider from another party (*e.g.*, another service provider, broker or fund manager), and includes:

a. Brokerage commissions, and any finder's fees

b. Float

c. Soft-dollar arrangements

d. Non-monetary compensation, gifts and entertainment

e.   Any other fee or payment received from any other party attributable to the provision of benefits under the plans or with respect to the contributions to, or assets of, the plans.

47.   Concurrently with the development of enhanced reporting for the Annual Report on Form 5500, the DOL released new regulations under ERISA § 408(b)(2) describing additional disclosures required of plan fiduciaries and other services providers necessary for the compensation received for such services to be considered "reasonable compensation." Those regulations paralleled the Form 5500 reporting requirements and required detailed disclosure of the direct compensation expected to be received from the plan as well as all indirect compensation expected to be received from others and a description of the services for which that compensation is being received.

48.   Perhaps the most important aspect of the new disclosure regulation is the admonition that the "information required to be prepared by the fiduciary for disclosure under this section shall be written in a manner calculated to be understood by the average plan participant." 29 CFR § 2550.404a-5(e)(5).

49.   According to the Verizon Plans' Summary Plan Descriptions, the Verizon Plans are designed to meet the requirements of ERISA Section 404(c), which provides that if a plan provides a broad range of investment choices and gives participants the ability to control the investment of their accounts among those investment choices, no plan fiduciary will be liable to participants for investment losses resulting from the participant's selection from among those investment choices. Notwithstanding that "safe harbor," the DOL has made it clear that the named fiduciaries of a 404(c) plan will always remain responsible for the prudent selection and monitoring of investment choices.

19

**The Verizon TDFs**

50.     The design of the custom Verizon TDFs clearly demonstrates the difficulty participants had making informed decisions with respect to the investment options offered by the Verizon Plans.  The ten TDFs, which are not technically standalone "funds", are simply asset allocation models that invest only in the other investment choices available under the Verizon Plans (and four other specialty custom funds that are used only for allocation of assets of the TDFs) in percentages specified by Russell Investment Group, which was selected by VIMCO to perform that fiduciary function.[14]

51.     TDFs are designed to allow retirement plan participants to invest in a single fund with a professionally-managed, broadly-diversified portfolio that becomes more conservative as the participant approaches retirement age. The investment strategy of each fund is based on a level of risk generally deemed appropriate for someone who expects to retire in the year of the fund's target date. The investment strategy assumes greater risk in the fund's early years and grows more conservative over time. For example, in the early years when investors have more time to bear short-term fluctuations in the stock market, each fund's asset allocation favors stocks to try to maximize returns. Then as the "target date" nears, money is gradually moved out of stocks and into more conservative investments, like bonds, to try to preserve the accumulated value of investors' accounts. TDFs are designed for retirement plan investors who do not want to create their own asset allocation using the plan's designated investment choices:  a "set-it-and-forget-it" approach that provides professional asset allocation advice.

---

[14] Verizon created TDFs for its employees to invest in, but they are not technically standalone funds, *e.g.,* with their own assets. The Verizon TDFs are just asset allocation mixes of the investment choices otherwise available, as well as four special custom funds that are only invested in via the Verizon TDFs.  This allows the Verizon TDFs to mimic standalone funds on a glide path to retirement, but without each TDF operating with its own assets as a standalone entity.

52.     The Verizon TDFs are not actual funds and do not exist as separate registered investment companies (mutual funds) or collective investment trusts ("CITs"), but are instead ten asset allocation models, designated as Target Date 2020, Target Date 2025, Target Date 2030, Target Date 2035, Target Date 2040, Target Date 2045, Target Date 2050, Target Date 2055, Target Date 2060, and a Retirement Income and Investment Fund. These funds invest participant accounts in the CITs, mutual funds, or separate accounts selected by VIMCO in varying percentages as determined by the Investment Committee, to achieve a level of risk that should be appropriate for an individual whose expected normal retirement date is closest to the year reflected in the name of the TDF.

53.     The separate asset allocations for each TDF are described in Investment Guide.

54.     As noted previously, the TDFs invest only in the other investment choices available to Verizon 401(k) Plan participants, plus four other custom funds that are not available as stand-alone investment choices to Verizon 401(k) Plan participants. Ten of those underlying funds are also custom funds that are funds of funds. For example, a percentage of the assets in each of the TDFs is allocated to the U.S. Large Company Fund which is in turn invested in seven other investment funds. No disclosure is provided to Verizon 401(k) Plan participants regarding investment objectives or risk and return characteristics of those underlying funds other than the name of the fund and the target percentage of assets of the TDF allocated to each underlying fund. Nor is any disclosure made to Verizon 401(k) Plan participants regarding the fees and expenses associated with the investment in any of the underlying funds in violation of 29 CFR § 2550.404a-5.

55.     The fee disclosure provided to participants in August 2015 indicates that there are differences in the expense ratios for the 2060 Fund, the 2055 Fund, the 2050 Fund, and the 2040 Fund, despite the fact that they all have exactly the same asset allocations.

56.     In 2012, VIMCO added the four additional specialty custom funds to be included in the allocation of assets of the TDFs, although those four additional funds would not be available as investment choices in the Verizon Plans: the commodities fund; the global listed infrastructure fund; the global equity with active currency overlay fund; and the global high yield (junk bond) fund.

57.     Each of these funds added additional levels of risk and undisclosed additional fees to the TDFs and the investment accounts of the Plaintiff and the Class with no corresponding increase in investment return.

58.     As disclosed in the *Investment Guide*, for example, "exposure to commodities markets may subject a fund to greater volatility than investments in traditional securities . . . ."

59.     As another example, in describing the Global Infrastructure Fund, Verizon discloses that "[i]nvestments in infrastructure-related companies have greater exposure to the potential adverse economic, regulatory, political and other changes affecting such entities. Investment in infrastructure related companies are subject to various risks including governmental regulations, high interest costs associated with capital construction programs, costs associated with compliance and changes in environmental regulation, economic slowdown and surplus capacity, competition from other providers of services and other factors. Investment in non-U.S. and emerging market securities is subject to the risk of currency fluctuations and to economic and political risks associated with such foreign countries." *Investment Guide* at 13.

60.      The description of the Global Equity with Currency Overlay includes this warning: "Non-U.S. markets and currency markets can be volatile. Combining active currency with U.S. and non-U.S. equity can result in substantially more volatility within a portfolio."

61.      The Global High Yield Bond portfolio was described as having "[g]reater risk, such as increased volatility, limited liquidity, prepayment, non-payment and increased default risk . . . inherent in portfolios that invest in high yield ("junk") bonds . . . ."

62.      ***These additional risks, however, have not borne the fruit of higher returns***. All of the TDFs have substantially underperformed popular, low-fee, passively-managed TDFs offered by Vanguard:[15]



63.      In other words, Verizon employees would have fared far better had Defendants simply offered them the option of investing in "off-the-shelf" Vanguard TDFs rather than riskier actively-managed custom-designed funds with higher and more complex fee structures.

---

[15] The "x" axis of this table and the following table measures "risk," calculated as the standard deviation of annual returns. The "y" axis of this table and the following tables measure "return," calculated as the geometric average of annual returns.

64.     The TDFs also markedly underperform alternative TDFs that can be constructed by simply varying the proportion of investments in standard stock index funds and a standard bond index fund[16] as the participant moves closer to retirement (*i.e.*, increasing the allocation to the stock fund for more distant years):



65.     Moreover, the aforementioned drag on performance of these riskier investments as compared to readily-available alternatives was or should have been known to VIMCO at the time. For example, Morningstar reported in its Target-Date Series Research Report, 2013 Survey: "For example, flows into commodities funds trailed off steeply in 2012 as performance declined." Morningstar Fund Research, Target-Date Series Research Paper 2013 Survey at 4 (2013), *available at* http:// corporate.morningstar.com/us/ documents/ResearchPapers/ 2013TargetDate.pdf (last visited Feb. 2, 2016). Notwithstanding that apparently obvious trend,

---

[16] The data used in this table is derived from reported returns for the Vanguard Total Bond Market Index, the Vanguard Total Stock Market Index, and the Vanguard Total International Stock Index.

that was the time VIMCO chose to increase the Verizon Plans' exposure to commodities by nearly $100 million.

66.     The most telling indicator that VIMCO's management of retirement plan assets was contrary to Verizon's own assessment of investment risk can be found in Verizon's actions with respect to its defined-benefit pension plan obligations. On October 17, 2012, Verizon filed with the United States Securities and Exchange Commission ("SEC") a Form 8-K announcing it had entered into a contract with The Prudential Insurance Company of America ("Prudential") whereby, by the end of 2012, its Verizon Management Pension Plan would end its responsibility to provide pensions to approximately 41,000 management retirees and Prudential would begin providing insurance annuities to such retirees. That transaction was executed and signed on December 10, 2012. As Verizon stated in a standardized letter sent to affected retirees: "Prudential will assume the responsibility for your pension benefit," in order to allow "Verizon to better focus on the core mission of providing the best communications network around the world."

67.     The dollar amounts involved in that transaction also reveal how important it was to Verizon to shed the risk associated with managing pension plan assets. As alleged in the complaint filed in the *Lee* case, Verizon (or more specifically, the Verizon Pension Plan) paid Prudential $8.4 billion in exchange for Prudential's assumption of $7.4 billion in pension liabilities.  In other words, the risk of liability for payment of pension benefits under the Verizon Pension Plan was apparently deemed by Verizon to be so great that it was willing to give up $1 billion in accumulated pension assets in order to avoid that risk.

68.     That was how Verizon chose to deal with its own investment risk under a defined-benefit pension plan.  When it comes to the investment risk borne by plan participants in the

defined-benefit 401(k) plans, VIMCO is not only acceptable but is the preferred investment manager.

69.    Verizon was also clearly ignoring industry trends, which increasingly disfavored active management of target-date funds. As reported in the Morningstar Target Date Series Research Paper 2013 Survey:[17]

> As noted in last year's Industry Survey, the growth rate of inflows to passively managed target-date funds has exceeded that of actively managed series for several years now. In 2012, that trend reached a milestone when, for the first time, the dollar amount of inflows to passively run series exceeded that of active series. Active funds still hold a comfortable majority of total assets under management, at 68%, but that size advantage has declined steeply since 2006, when the industry was 85% active (see Exhibit 4). As an estimate, if the average asset growth rates over the past three years were to continue (11% asset growth for actively managed series as a whole and 26% asset growth for passively managed series), then total assets in passively managed series would surpass that of actively managed series by the end of 2019. Clearly, Vanguard's success has influenced fees, construction, and performance industrywide, and many rivals have sought to blunt Vanguard's dominance by introducing passive investments in one form or another into their own target-date offerings.

### The Global Opportunity Fund

70.    VIMCO has also demonstrated its inability to effectively monitor the managers it has selected to invest the assets of its custom funds, as evidenced by the persistently poor performance of the Global Opportunity Fund. Over a ten-year period, this fund had an average annual return of 1.74% compared to its benchmark, which returned 10.37% over that same ten-year period. The investment earnings of the Global Opportunity Fund barely beat a money market fund that returned 1.70% annually for the ten-year measurement period.[18]

---

[17]   Morningstar, Target Date Series Research Paper:    2013 Survey, *available at* http://corporate.morningstar.com/us/documents/ResearchPapers/2013TargetDate.pdf (last visited Feb. 4, 2016).

[18] A money market fund is a mutual fund that invests in short-term, cash-equivalent assets, such as U.S. Treasury bills and commercial paper.  Money market funds are designed to be low-risk, low-return investments.   They are explicitly **not** designed for long term investing, which

71.    Despite this poor performance, the Global Opportunity Fund has the highest expense ratio of any of the Verizon Plans' investment choices and remains one of the core investment choices for the Verizon Plans and one of the funds that receives an allocation from each of the TDFs. And again, despite this poor performance, the allocation to the Global Opportunity Fund within the TDF family increases over time, so that it represents five percent of the asset allocation in the Retirement Income and Investment Fund.

72.    The Global Opportunity Fund has two managers: Rock Creek Partners, which manages 70% of the Fund, and Bridgewater Associates, which manages the remaining 30%. The disclosures made by Verizon to participants describing the Global Opportunity Fund lack any useful information (in the case of the 70% managed by Rock Creek) or, in the case of the Bridgewater-managed portion of the Fund, only describe an investment strategy likely to be understood by only the most sophisticated of investors. The only information provided with respect to the 70% of the Fund managed by Rock Creek states: "VIMCO has chosen Rock Creek Partners, L.P. ("Rock Creek") as the manager responsible for overseeing approximately 70% of the Global Opportunity Fund, including the selection of the underlying investment products."

73.    In stark contrast to the description of Rock Creek's investment strategy, the Bridgewater portion of the fund is described in the Supplement to Offering Statement for the Plan dated March 14, 2014 (the Supplement") as follows[19]:

> The remaining 30% of the Global Opportunity Fund uses a strategy known as "risk parity," which focuses on selecting assets based on their expected volatility, or risk, (i.e., variations over time in their returns) rather than on their expected return. As a simplified example of the focus of this strategy,

---

underscores the problem with the fact that the Global Opportunity Fund performed just slightly better. *See* Investopedia, *Money Market Fund*, *available at* http://www.investopedia.com /terms/m/money-marketfund.asp ) (last visited Feb. 2, 2016).

[19] Verizon, Supplement to Offering Statement for the Plan at S-14 (Mar. 14, 2014) [hereinafter *Supplement*], attached hereto in its entirety as **Exhibit 2**.

suppose you have two portfolios that each has an 8% expected return, except that one portfolio has 2% volatility and the other has 4% volatility. Although the portfolios have the same expected return, the more volatile portfolio is twice as likely to have a large decrease (or increase) in value. A risk parity strategy attempts to equalize, or at least spread more evenly, the risk associated with each of the various asset classes in which a given portfolio invests. In this simplified example, the use of a risk parity strategy would cause the investment in stocks in the portfolio having the higher volatility to be reduced and the investment in bonds in such portfolio to increase. Because the difference in volatility between stocks and bonds is so great, the portfolio likely would add leverage (typically by using derivatives) to bring the risk of its bond investments more into line with the risk of its (reduced) stock portfolio. Such a strategy should increase the expected return of the bond portion of the portfolio. As a result, the risk parity adjusted portfolio would be expected to have generally the same return as the original portfolio, but with less overall risk because the risk parity adjusted portfolio would have greater diversification.

74.     The performance of the Global Opportunity Fund was as poor as the disclosures describing of the investment strategies, as demonstrated in the following table:[20]

| GLOBAL OPPORTUNITY FUND PERFORMANCE COMPARISON | | | |
|---|---|---|---|
| Performance | Global Opportunity Fund | Verizon Benchmark | MSCI World Stock | 60/40 World Agg |
| One-year | 1.67% | 8% | 26.7% | 15.0% |
| Five-Year | 5.95% | 10.85% | 15.0% | 10.8% |
| Ten-Year | 1.32% | 11.18% | 7.0% | 6.6% |

75.     Under ERISA, a fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l*, __ U.S. __, 135 S. Ct. 1823, 1828 (2015).

---

[20] The 60/40 World Agg represents the hypothetical return of a portfolio invested 60% in global stocks and 40% in global bonds.

76.     It should be immediately apparent from the dramatic and persistent underperformance of the Global Opportunity Fund that Verizon utterly failed in its responsibility to monitor the performance of the Fund and to take appropriate action to remove the imprudent investment.

77.     Verizon appears to have noticed the underperformance and simply elected to use a different measuring stick rather than correct the problem. According to the Plan's participant fee disclosure for 2015 and the Verizon Management Savings Plan Performance Sheet as of June 30, 2015, the benchmark was changed twice; once in 2012 and again in 2015,[21] apparently having determined that it was not fund performance that was deficient, but rather that the benchmark performed too well in comparison and that the performance of the Global Opportunity Fund could be improved simply by comparing it to an index that showed lower returns that the benchmark originally chosen.

## FIDELITY'S EXCESSIVE FEES AND DISCLOSURE FAILURES

78.     FMTC ("Fidelity"), as the recordkeeper for the Verizon Plans, is obligated to provide to Verizon the disclosures required by ERISA § 408(b)(2) and 29 CFR § 2550.408b-2(c), as well as the disclosures required for Verizon to file its Annual Return on Form 5500. 29 CFR § 2550.103-1.

79.     On information and belief, Fidelity was also delegated the authority to design and produce a participant fee disclosure on behalf of Verizon which would comply with the requirements of 29 CFR § 2550.404a-5(c)(2) (the "Participant Fee Disclosure").   Because 29

---

[21] A notice dated December 2014 entitled "Verizon Savings Plan for Management Employees Target Date Fund Changes and Benchmark Changes Notice" stated: "As of January 1, 2015, the benchmark used to evaluate performance of this fund will change from its current fixed rate of 8.00% to a floating rate of one month LIBOR (London Interbank Offered Rate) plus 4.00%."

CFR § 2550.404a-5(c)(2) creates a fiduciary obligation to disclose the information enumerated in that regulation, the design, production and delivery of that information is undeniably fiduciary in nature, making Fidelity a fiduciary with respect to the Participant Fee Disclosure.  Even so, Fidelity exercised such a high level of control over the process that it effectively assumed fiduciary responsibility for compliance with the participant fee disclosure rule.  As already noted, Fidelity's biggest failure in the satisfaction of that obligation was in the inadequate disclosure of its own compensation.

80.     The Participant Fee Disclosure rule imposes a fiduciary duty on the Plan Administrator, usually the plan sponsor, to deliver the disclosure to plan participants.  While it is the duty of the Plan Administrator to prepare and deliver the disclosure, most of the detailed information required to be disclosed is information maintained on the Verizon Plans' recordkeeping system and, therefore, must be made available to the Plan Administrator in order to fulfill its fiduciary obligation.

81.     At the time the Participant Fee Disclosure rule became effective, Fidelity was trying to develop a universal Participant Fee Disclosure for all of its customers that could be automatically generated by the Fidelity receordkeeping system and its interfaces with other programs such as Morningstar.  Essentially, Fidelity's business plan would turn the disclosure into a product that, once programmed, would be automatically generated for its thousands of 401(k) plan recordkeeping customers.  Due to programming costs and other considerations, the strategy would only work, however, if virtually all of its customers accepted Fidelity's model disclosure.  In order to help ensure this result, Fidelity offered to its customers a false choice: either accept Fidelity's model report for one cost, or have Fidelity prepare a disclosure individually designed for that customer's plan for a cost that was dramatically higher.

82.   On information and belief, the majority of Fidelity's customers accepted the model disclosure.  Acceptance of the Fidelity model was conditioned on an understanding that there would be certain limits on the customization of the disclosure for any particular customer. Nonetheless, the underlying obligation of Fidelity under ERISA was to produce a disclosure that satisfied the conditions of the Participant Fee Disclosure rules.

83.   By pursuing this business plan, Fidelity necessarily accepted fiduciary responsibility to produce a disclosure that satisfied the obligations of the rule.  On information and belief, there were multiple instances during the relevant time period in which Fidelity refused to correct obvious errors in the disclosure simply because the errors were rooted in the programming of the automated system.

84.   The most blatant error in Fidelity's reporting was with respect to the disclosure of Fidelity's own compensation.  The Participant Fee Disclosure is prepared in retrospect; that is, it is required to report the specified information as of the preceding December 31, at a time when Fidelity clearly understood exactly what compensation was received.

85.   In a persistent and concerted effort to conceal from participants the extent of the compensation Fidelity receives from the Verizon Plans, Fidelity failed to report the amount of indirect compensation it has received in connection with participants' investments in the Verizon Plans' designated investment alternatives for both 5500 reporting purposes and in preparing the Participant Fee Disclosure.

86.   The DOL's enhanced requirements for reporting compensation received by service providers to qualified retirement plans was first effective for the 2009 plan year and required disclosure of all direct and indirect compensation received.  The instructions for the Form 5500 further distinguished between "indirect compensation" and "eligible indirect

compensation."    Instructions to Schedule C define "eligible indirect compensation" as "[i]ndirect compensation that is fees or expense reimbursement payments charged to investment funds and reflected in the value of the investment or return on investment of the participating plan or its participants[,] finders' fees[,] 'soft dollar' revenue, float revenue, and/or brokerage commissions or other transaction-based fees for transactions or services involving the plan that were not paid directly by the plan or plan sponsor."    The disclosure of eligible indirect compensation does not require the same level of detail required for the disclosure of direct or indirect compensation and can be expressed as an estimate or as the formula used to determine such compensation.

87.    The amounts received by Fidelity from the various managers of the Verizon Plans' designated investment alternatives, including in a number of instances affiliates of Fidelity, did not meet the definition of "eligible indirect compensation."    Moreover, the DOL in published Frequently Asked Questions regarding the 2009 Form 5500 reporting requirements stated explicitly:

> Amounts received by a plan recordkeeper from fund agents would not constitute eligible indirect compensation on the basis of being "other transaction-based fees for transactions or services involving the plan" merely because the plan had to make an investment in the mutual fund before the recordkeeper would receive any fees. If such a broad interpretation of "transaction-based fees for transactions or services involving the plan" were adopted for purposes of the eligible indirect compensation definition, it would substantially undermine the bundled fee reporting option which requires "transaction based" fees to be reported separately from the bundle.[22]

88.    Notwithstanding that guidance, for the 2009 Plan year, Section 1 of the Form 5500 filing for the Management Savings Plan indicated that FIIOC reported receiving ***only*** eligible indirect compensation. Section 2 of the Form 5500 indicated that Fidelity had received

---

[22] U.S. Dept. of Labor, Q&A 8, Frequently Asked Questions The 2009 Form 5500 Schedule C, *available at* http://www.dol.gov/ebsa/faqs/faq_schedulec.html (last visited Feb. 2, 2016).

$4,134,796 in direct compensation and Section 3 of the Form 5500 reported that FIIOC had received additional indirect compensation from three unaffiliated mutual funds, but made no additional disclosure regarding indirect compensation it had received from Fidelity affiliates.

89.     The 2010 Form 5500 for the Management Savings Plan indicated that Fidelity reported $4,854,522 in direct compensation but that it had received no indirect compensation, even though amendments to the Trust Agreement between Verizon and Fidelity stated explicitly that Fidelity was receiving payment from both unaffiliated funds and from affiliated funds.

90.     The 2011 Form 5500 for the Management Savings Plan indicated that Fidelity reported $4,376,041 in direct compensation and that it had received indirect compensation, including eligible indirect compensation, but failed to report any required additional information about that indirect compensation, even though amendments to the Trust Agreement between Verizon and Fidelity stated explicitly that Fidelity was receiving payment from both unaffiliated funds and from affiliated funds, including 5 basis points with respect to each of the Verizon Plans' TDFs and all other "unitized" funds.

91.     The participant fee disclosure prepared by Fidelity for 2013 and 2014 explicitly states that each participant's account is charged an annual recordkeeping fee of $25.   The disclosure states further: "Remaining Plan administrative fees that are paid by the Plan are charged to the Tier 1 and Tier 2 investment options other than the PIMCO Real Return Bond Fund. These fees are included in determining the asset-based fees of each affected investment option."  Fidelity made that cryptic statement despite the fact that it knew exactly what portion of the asset-based fees was being charged for those remaining plan administrative expenses with respect to each designated investment alternative in the Verizon Plans, as well as the exact dollar amount that Fidelity had received in connection with those charges.  The statement appears to

have been deliberately designed to conceal the total amount of compensation being received by Fidelity and the portion of the expense ratio of the Verizon Plans' investment choices being applied to pay recordkeeping expenses.

92.     The concealment of Fidelity's compensation leaves unanswered the question of whether that compensation was reasonable.  In any event, the absolute failure to disclose that compensation is a violation of Fidelity's and Verizon's reporting requirements under EBSA and DOL regulations, and a violation of Verizon's and Fidelity's fiduciary obligation under ERISA § 404(a).

## THE DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

93.     ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B), require that the Verizon Plans' fiduciaries "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and: a. for the exclusive purpose of: i. providing benefits to participants and their beneficiaries; and ii. defraying reasonable expenses of administering the plan; b. with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

94.     ERISA § 405(a), 29 U.S.C. § 1105(a), provides that one fiduciary may be held liable for breaches of fiduciary duty committed by another fiduciary where (1) the fiduciary "participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach"; (2) the fiduciary, by his or her "failure to comply with section 1104 (a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary" enables "such other fiduciary to commit such a breach"; or (3)

the fiduciary "has knowledge of a breach by such other fiduciary," and does not make "reasonable efforts under the circumstances to remedy the breach."

95.     ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator periodically provide to Plan participants and beneficiaries a summary plan description ("SPD").

96.     ERISA § 104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator at least annually provide to Plan participants and beneficiaries copies of statements and schedules from the Verizon Plans' annual report for the previous year, and such additional information "as is necessary to fairly summarize the latest annual report."

97.     ERISA § 103(b)(2) & (3), 29 U.S.C. § 1023(b)(2) & (3) mandates that, among other extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report" a statement of [the Plan's] assets and liabilities, and a statement of changes in net assets available for plan benefits which shall include details of revenues and expenses and other changes aggregated by general source and application.

98.     ERISA § 404(c) provides to plan fiduciaries a "safe harbor" from liability for losses that a participant suffers in their 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts. To be eligible for the protection of this "safe harbor," plan fiduciaries must, among other things, provide: "an opportunity for a participant or beneficiary to exercise control over assets in his individual account," and must provide "a participant or beneficiary with an opportunity to choose, from a broad range of investment alternatives, the manner in which some or all of the assets in his account are invested." 29 C.F.R. § 2550.404c-1(b)(1).

99.     For a participant or beneficiary to be deemed to have "an opportunity to exercise control over assets in his individual account" within the meaning of 404(c), the plan fiduciaries

must provide him or her with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan." 29 C.F.R. § 2550.404c-1(b)(2)(i)(B).

100.    The "sufficient investment information" that plan fiduciaries must provide to participants includes a range of investment-related information, including: information relating to the type or category of investment, the investment objectives and risk and return characteristics of the fund and the type and diversification of assets, performance history, the name of an appropriate broad-based market index against which to measure fund performance and the performance of the benchmark over the same period covered by the fund's performance history. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(v). It must also include a description of the annual operating expenses of each designated investment alternative (*e.g.*, investment management fees, administrative fees, and transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(i).

101.    ERISA's safe harbor regulations state that the imposition of reasonable charges for reasonable plan expenses does not interfere with a participant's opportunity to exercise control over his/her individual account so long as plan fiduciaries inform the participant of such actual expenses. A plan may charge participants' and beneficiaries' accounts for the reasonable expenses of carrying out investment instructions, provided that procedures are established under the plan to periodically inform such participants and beneficiaries of actual expenses incurred with respect to their respective individual accounts. 29 C.F.R. §2550.404c-1(b)(2)(ii)(A).

A.   **VERIZON'S AND VIMCO'S BREACH OF THEIR DUTY OF PRUDENCE UNDER ERISA SECTION 404(a) IN THE DESIGN AND MANAGEMENT OF THE VERIZON TDFs**

102.   Defendants' introduction of the Global High Yield Fund, the Commodities Fund, the Global Equity With Currency Overlay Fund and the Global Listed Infrastructure Fund (collectively the "Alternative Investments") to the asset allocation mix of the Verizon TDFs imposed significant additional risk on all ten of the TDFs. This was particularly true for the 2040, 2045, 2050, 2055 and 2060 TDFs, which allocated more than 30% of their assets to the Alternative Investments. Even the 2035 TDF allocated 28.7% of its assets to these imprudent and risky investments. Importantly, Defendants added these risky investments to the TDFs at a time when other managers of TDFs were eliminating commodities and other alternative investments from the target date fund portfolio due to the excessive risk associated with such investments and their poor performance, as widely reported in the financial press.

103.   Even more importantly, VIMCO introduced this additional and inappropriate level of risk to its TDFs at the same time as it took significant steps to reduce the level of risk to Verizon Communications' defined benefit pension plan for management employees. This demonstrates that adding higher-risk investments to the TDFs at the time was not only inconsistent with the conduct of a reasonable fiduciary under the circumstances, but contrary to VIMCO's and Verizon Communications' own fiduciary judgment in managing the assets of a retirement plan for which Verizon bore the investment risk.  The addition of the Alternative Investments to the asset mix of the TDFs was imprudent even by Verizon's own standard of conduct.

B.   **VERIZON'S AND VIMCO'S BREACH OF THEIR DUTY OF PRUDENCE UNDER ERISA SECTION 404(a) IN FAILING TO MONITOR ADEQUATELY THE PERFORMANCE OF THE GLOBAL OPPORTUNITY FUND AND RETAINING THAT FUND DESPITE YEARS OF POOR PERFORMANCE**

104.   VIMCO and Verizon also have failed to exercise due diligence and prudence in carrying out its fiduciary obligation to monitoring the performance of the Global Opportunity Fund. As previously alleged, the Global Opportunity Fund has significantly underperformed its benchmark for ten years. Despite such underperformance, Defendants have retained the fund both as an investment option for participants and as part of the asset allocation mix for the TDFs. Until 2012, when the Alternative Investments were introduced to the TDFs, 13% of the assets of each of the six longer-term TDFs was allocated the Global Opportunity Fund. Had Defendants acted prudently and exercised appropriate diligence in monitoring fund performance, as required by ERISA Section 401(a), it would have eliminated the Global Opportunity Fund from the Verizon Plans' investment options and from the asset allocation mix for the TDFs. As a result of their failure to do so, participants have suffered losses attributable to their direct and indirect investments in the Global Opportunity Fund, for which Defendants are liable.

C.   **VERIZON'S FAILURE TO COMPLY WITH THE DISCLOSURE REQUIREMENTS OF ERISA SECTION 404(a) AND ERISA § 404(c) AND ITS CONCEALMENT OF FIDUCIARY BREACHES**

105.   As previously alleged, the Verizon Defendants created a retirement investment structure for its workers that is so convoluted and layered, and so lacking in clear disclosures, particularly with respect to the TDFs, that it is virtually impossible for the average Verizon employee to gain enough information about the available investment choices, including the strategies and attendant risks of the components of the investment choices and the actual amount of fees and expenses associated with the investment choices, to make informed decisions about

how their retirement funds should be invested.  Defendants' failure to provide the information necessary for participants to understand the impact of their investment decisions in the context of such a complex investment structure violates Defendants' affirmative obligation under 29 C.F.R. § 2550.404a-5 to disclose specified plan-related and investment-related information necessary for a participant to understand and effectively exercise his or her rights under the Verizon Plans.

106.    Because the Defendants failed and refused to provide them with this information, and concealed this information from them, the participants and beneficiaries who are Class members here lacked the information necessary to understand and protect their interests in the Verizon Plans and/or to have knowledge of the Defendants' breaches of fiduciary duty.  Based upon the foregoing, Defendants have breached their fiduciary duty under 29 C.F.R. § 2550.404a-5.

107.    Verizon's failure to provide that information required to be provided by 29 C.F.R. § 2550.404a-5 also constitutes a failure to provide sufficient information to Plaintiff and the members of the proposed necessary to enable them to exercise effect control over the investment of their accounts.  Accordingly, the Verizon Defendants are not entitled to the safe harbor protections of ERISA § 404(c).

**D.    FIDELITY'S FAILURE TO COMPLY WITH THE DISCLOSURE REQUIREMENTS OF ERISA SECTION 404(a) AND CONCEALMENT OF FIDUCIARY BREACHES**

108.    Fidelity persistently failed to accurately report information required to be provided to Verizon as Plan Administrator for purposes of filing the Verizon Plans' Annual Return on Form 5500 in order to conceal the amount of compensation Fidelity was receiving for providing recordkeeping services to the Verizon Plans.

109.    When the Participant Fee Disclosure rule became effective, Fidelity deliberately designed a disclosure intended to further conceal from the Plaintiff and the members of the proposed Plan Class the amount of compensation it was receiving for recordkeeping services, even though a principal purpose of the Participant Fee Disclosure rule was to ensure that Plan participants understood the fees and expenses that were being charged directly or indirectly to their accounts for plan administrative services.  As a result, the Plaintiff and the members of the proposed Plan Class have been deprived of information that was essential to a complete understanding of Plan operations and the fees and expenses being charged to their accounts, and prevented them from exercising their rights under the Verizon Plans and under ERISA.

## CLASS ACTION ALLEGATIONS

110.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself and all similarly situated participants and beneficiaries. She seeks certification of a Class of participants in the Verizon Plans, with overlapping subclasses defined based on each of Plaintiff's claims for breach of fiduciary duties, as follows:

a.  **The Verizon Plan Class**:  All participants or beneficiaries of the Verizon Savings Plan for Management Employees, the Verizon Savings & Security Plan for Mid-Atlantic Associates, the Verizon Savings & Security Plan for New York & New England Associates, and the Verizon Savings & Security Plan for West Region Hourly Employees (the "Verizon Plans"), excluding the Defendants, other VIMCO or Verizon employees with responsibility for the Verizon Plans' investment or administrative functions, and members of the Verizon Board of Directors, who received false and misleading Participant Fee Disclosure from the Verizon Defendants (by and through Fidelity);

b. **Target Date Fund Subclass**: All participants or beneficiaries of the Verizon Plans, excluding the Defendants, other VIMCO or Verizon employees with responsibility for the Verizon Plans' investment or administrative functions, and members of the Verizon Board of Directors, who had any portion of their accounts in the Verizon Plans invested in any of the Verizon TDFs; and

c. **Global Opportunity Fund Subclass**: All participants or beneficiaries of the Verizon Plans, excluding the Defendants, other VIMCO or Verizon employees with responsibility for the Verizon Plans' investment or administrative functions, and members of the Verizon Board of Directors, who had any portion of their accounts in the Verizon Plans invested directly in the Global Opportunity Fund or indirectly in the Global Opportunity thought investment in any of the Verizon TDFs.

111.    Certification of this Class and subclasses is proper under Rule 23(a) because all prerequisites are satisfied:

a. *Numerosity*. The members of the Class are so numerous that joinder of all members is impracticable. Although the Plaintiffs do not know the exact number of Class members as of the date of filing, there were more than 140,000 participants with account balances in the Plan at the end of the 2014 plan year.

b. *Commonality*. Common issues of fact and law predominate over any issues unique to individual class members. Issues that are common to all class members include, but are not limited to, whether:

41

i.   Defendants Verizon and the Verizon EBC were prudent in continuing to delegate fiduciary responsibility for the investment of Plan assets to VIMCO;

ii.  Defendant VIMCO failed to monitor the performance of investment managers and the fees and expenses paid by the Verizon Plans and, by such failure, caused or allowed the Verizon Plans to suffer investment losses and to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Verizon Plans;

iii. The Verizon Defendants failed to prudently oversee the performance of the investment options in the Verizon Plans, and included investment options in the Verizon Plans which were inappropriate for generating long-term retirement savings;

iv.  Defendant VIMCO failed to inform itself of, and understand, trends in the 401(k) marketplace that were indicative of best practices and methods of achieving greater efficiencies with respect to the design of investment strategies for 401(k) plans;

v.   Defendant VIMCO fraudulently concealed the underperformance of the TDFs by the use of custom benchmarks that were misleading to participants;

vi.  The Verizon Defendants and Fidelity failed to properly inform and/or disclose to participants and beneficiaries of the Verizon Plans the fees and expenses that are, or have been, paid by the Verizon Plans;

vii.   The Verizon Defendants failed to inform and/or disclose to participants and beneficiaries of the Verizon Plans in proper detail the investment objectives and risk and return characteristics of the TDFs;

viii.   The Verizon Defendants appointed as fiduciaries persons who did not fulfill their fiduciary duties, failed to monitor and/or oversee the performance of those fiduciaries and to ensure that they were fulfilling those duties, and failed to terminate the fiduciaries' appointment after breaches occurred;

ix.   The Verizon Defendants and Fidelity failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters; and

x.   Defendants, by the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Verizon Plans, participants and beneficiaries of the Verizon Plans, and members of the classes.

c.   *Typicality*. The claims brought by the Plaintiffs are typical of those of the absent class members because:

i.   The Defendants owed the exact same fiduciary and other ERISA based obligations to each Plan participant and each member of the Classes;

ii.   The Defendants' breach of those obligations constitutes a breach to each participant and each member of the classes;

43

iii. As to the claims regarding imprudent Plan investments or excessive fees, there is a congruence between the investments held by the named Plaintiff/class representatives and those held by the members of the subclasses. Plaintiff Melina Jacobs held investments in the Verizon 2040 TDF, the Emerging Markets Fund, the Conservative Fixed Income Fund and the Verizon Company Stock Fund; and

iv. To the extent that there are any differences among class members' damages, such differences would be a product of simple mathematics based upon their account balances in the Verizon Plans. Such minimal and formulaic differences are no impediment to class certification.

d. *Adequacy of Representation*. Plaintiff has been injured by the breaches of fiduciary duty alleged herein and is committed to fairly, adequately, and vigorously representing and protecting the interests of the members of the class. Plaintiff is an adequate representative of the absent class members and will protect such absent class members' interests in this litigation. Plaintiff does not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the classes' claims. Plaintiff have retained competent counsel, versed in ERISA, class actions, and complex litigation.

112. Class certification is also appropriate under Rule 23(b) and each subpart because:

a. Pursuant to Rule 23(b)(1), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

b. Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted

on grounds generally applicable to each class as a whole; and

c.   Pursuant to Rule 23(b)(3), as set forth above, common issues of law and

fact predominate over any purely individual issues and thus a class action is

superior to any other method for adjudicating these claims.

113.    On information and belief, the names and addresses of the class members are available from Defendants and/or the Verizon Plans, and adequate notice can be provided to members of the class to the extent required by Fed. R. Civ. P. 23.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### [Breach of Fiduciary Duty Under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3) – TDFs]

114.    Plaintiff incorporates each of the proceeding paragraphs as if set forth fully herein.

115.    ERISA defines a fiduciary as anyone who exercises authority or control over the management or disposition of plan assets.  29 U.S.C. § 1002(21)(a).

116.    As set forth above, Defendants were fiduciaries for the Verizon Plans and their participants and beneficiaries, including Plaintiff and the proposed Class.

117.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia,* that a plan fiduciary discharge his, her, or its duties with respect to a plan solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

118.    The DOL and various courts have interpreted this duty time and again. In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts

45

and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary

knows or should know are relevant to the particular investment or investment course of action

involved, including the role that the investment or investment course of action plays in that

portion of the plan's investment portfolio with respect to which the fiduciary has investment

duties." 29 C.F.R. § 2550.404a-1(b)(1). "Appropriate consideration," according to DOL

regulations, includes but is not necessarily limited to:

> "(i) [a] determination by the fiduciary that the particular investment or investment
> course of action is reasonably designed, as part of the portfolio (or whether
> applicable, that portion of the plan portfolio with respect to which the fiduciary
> has investment duties), to further the purposes of the plan, taking into
> consideration the risk of loss and the opportunity for gain (or other return)
> associated with the investment or investment course of action; and (ii)
> [c]onsideration of the following factors …: (A) [t]he composition of the portfolio
> with regard to diversification, (B) [t]he liquidity and current return of the portfolio
> relative to the anticipated cash flow requirements of the plan; and (c) [t]he
> projected return of the portfolio relative to the funding objectives of the plan."
> 29 C.F.R. § 2550.404a-1(b)(2).

119.    Defendants' appointment of fiduciaries, design of the TDFs and the underlying

custom funds, and monitoring of the performance of and fees charged by the various managers of

those funds, violated their fiduciary duties to act prudently and solely in the interests of plan

participants as set forth above.

120.    Defendants' failure to properly disclose investment-related information required

by 29 C.F.R. § 2550.404a-5 is a breach of the Defendants' express fiduciary obligation to ensure

that participants have adequate information to effectively exercise their rights under the Verizon

Plans. ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia,* that any person who is a fiduciary

with respect to a plan and who breaches any of the responsibilities, obligations, or duties

imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan

any losses to the plan resulting from each such breach, and additionally is subject to such other

equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

121.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring an action for relief under ERISA § 409.

122.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring an action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

123.    The Verizon Defendants' actions with respect to the design and administration of the Verizon TDFs caused the Verizon Plans to incur losses from diminution of investment returns as well as excessive fees in an amount to be proven at trial and Defendants are liable for such losses.

## SECOND CLAIM FOR RELIEF

### [Breach of Fiduciary Duty Under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3) – Global Opportunity Fund]

124.    Plaintiff incorporates each of the proceeding paragraphs as if set forth fully herein.

125.    As set forth above, the Verizon Defendants were fiduciaries for the Verizon Plans and their participants and beneficiaries, including Plaintiff and the proposed Class.

126.    Under ERISA, a fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l*, __ U.S. __, 135 S. Ct. 1823, 1828 (2015).

127.    The Global Opportunity Fund has performed poorly for many years despite having the highest fees of any of the Verizon Plans' available investment choices, yet the

Verizon Defendants persistently failed to take any corrective action and continued to maintain significant allocations of TDF assets to the Global Opportunity Fund.

128.    The Verizon Defendants' failure to adequately monitor the performance of the Global Opportunity Fund and the failure to take any corrective action regarding that fund despite obvious and long-term underperformance has caused the Verizon Plans to incur losses from diminution of investment returns as well as excessive fees in an amount to be proven at trial and Defendants are liable for such losses.

## THIRD CLAIM FOR RELIEF

### [Breach of Fiduciary Duty Under ERISA §§ 404(a) 29 U.S.C. §§ 1104(a) – Required Plan and Investment-Related Disclosures]

129.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) and regulations issued thereunder, specifically, 29 CFR § 2550.404a-5, require, *inter alia,* that the Plan Administrator provide a significant amount of detailed plan-related and investment-related information annually in the form of the Participant Fee Disclosure.

130.    ERISA § 104(a)(1) and the regulations thereunder require annual reports to be filed with the Secretary of Labor disclosing specific financial information regarding the operation of the Verizon Plans, including a report of all direct and indirect compensation received by Fidelity and its affiliates.

131.    The Fidelity Defendants delivered false and misleading information regarding its direct and indirect compensation for purposes of the filing the Verizon Plans' Annual Return on Form 5500.

132.    Fidelity designed the Participant Fee Disclosure in a failed to disclose its compensation in any meaningful manner, in direct contravention of DOL regulations that focus

specifically on the disclosure of administrative expenses charged directly or indirectly to participant accounts.

133.    The Verizon Defendants knew or should have known Fidelity's disclosures were incomplete, false and misleading, and failed to take any reasonable action to require that those deficiencies be corrected, and either actively participated in the disclosure failure or chose to be willfully ignorant of Fidelity's failure.

134.    As a result of Defendants' failures to satisfy their disclosure requirements, Plaintiff and the proposed Class have suffered from an inability properly to understand and enforce their rights under the Verizon Plans and to manage their accounts.

135.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring an action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment as follows:

A.    Certify this action as a class action and appoint Plaintiff's counsel as Class Counsel pursuant to Federal Rule of Civil Procedure 23;

B.    Declare that Defendants have breached their fiduciary duties to the Class;

C.    Enjoin Defendants (i) to correct past disclosure deficiencies; and (ii) from further violations of their fiduciary responsibilities, obligations, and duties under ERISA;

D.    Order that Defendants make good to the Verizon Plans the losses resulting from their breaches of fiduciary duty;

E.    Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the

common fund;

        F.     Order Defendants to pay prejudgment interest; and

        G.    Award such other and further relief as the Court deems equitable and just.

DATED this 11th day of February, 2016.

                           HARWOOD FEFFER LLP

                 By:    <u>s/ Robert I. Harwood</u>
                           Robert I. Harwood
                           Peter W. Overs, Jr.
                           488 Madison Avenue, 8th Floor
                           New York, New York 10022
                           Telephone: (212) 935-7400
                           Facsimile:  (212) 753-3630
                           rharwood@hfesq.com
                           povers@hfesq.com

                           *Counsel for Plaintiff*

*Of Counsel*:

John F. Edgar
Michael D. Pospisil
Boyce N. Richardson
EDGAR LAW FIRM LLC
1032 Pennsylvania Avenue
Kansas City, Missouri 64105
Telephone: (816) 531-0033
Facsimile: (816) 531-3322
jfe@edgarlawfirm.com
mdp@edgarlawfirm.com
bnr@edgarlawfirm.com

Garrett W. Wotkyns
Michael McKay
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Rd., Suite 270
Scottsdale, Arizona  85253
Telephone: (480) 428-0145
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
mmckay@schneiderwallace.com

Todd M. Schneider
Mark T. Johnson

Kyle G. Bates
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California  94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
mjohnson@schneiderwallace.com