UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MELINA N. JACOBS, On Behalf of Herself and
All Others Similarly Situated,

Plaintiff,

- against -

VERIZON COMMUNICATIONS INC.;
VERIZON INVESTMENT MANAGEMENT
CORP.; THE VERIZON EMPLOYEE
BENEFITS COMMITTEE; MARC C. REED;
MARTHA DELEHANTY; ANDREW H.
NEBENS; CONNIA NELSON; SHANE
SANDERS; ROBERT J. BARISH; DONNA C.
CHIFFRILLER,

Defendants.

**MEMORANDUM
OPINION & ORDER**

16 Civ. 1082 (PGG) (RWL)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Melina N. Jacobs brings this class action pursuant to Section 502(a) of

the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. 1132(a).  Plaintiff

claims that Verizon Communications Inc. ("Verizon"), Verizon Investment Management Corp.

("Verizon Investment"), the Verizon Employee Benefits Committee (the "Benefits Committee"),

and certain individual members of the Benefits Committee, breached their fiduciary duty to

monitor the investment options offered by the Verizon Savings Plan for Management Employees

(the "Savings Plan"), and to remove imprudent investment options.  (Cmplt. (Dkt. No. 1) ¶¶ 127-

28)

Defendants have moved (1) for summary judgment (Dkt. No. 180); (2) to strike

portions of Plaintiff's summary judgment opposition papers (Dkt. No. 177); (3) to exclude

evidence from Plaintiff's expert witnesses (Dkt. No. 173); and (4) to strike Plaintiff's jury demand (Dkt. No. 171).

For the reasons set forth below, Defendants' motion to strike portions of Plaintiff's summary judgment opposition papers will be granted to the extent that Plaintiff's submissions are not in compliance with Local Rule 56.1; Defendants' motion to exclude evidence from Plaintiff's expert witnesses will be denied; Defendants' motion for summary judgment will be denied; and Defendants' motion to strike Plaintiff's jury demand will be granted.

## BACKGROUND

## I.   FACTS

### A.   The Global Opportunity Fund as a Component of Defendants' Target Date Funds

Plaintiff worked at Verizon from 2014 until 2018, was a participant in the Savings Plan, and invested in a target date fund that included allocations to, inter alia, the Global Opportunity Fund.  (Def. R. 56.1 Stmt. (Dkt. No. 182) ¶¶ 9, 11, 64)[1]

---

[1]  Defendants have moved to strike portions of Plaintiff's summary judgment opposition papers as not in compliance with Local Rule 56.1.  (Def. Mot. (Dkt. No. 177))

To the extent that this Court relies on facts drawn from the Defendants' Local Rule 56.1 statement and Plaintiff's Local Rule 56.1 counterstatement, it has done so because the opposing party or parties have either not disputed the factual assertions or have not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); Local Civ. R. 56.1(d) ("Each statement by the movant or opponent . . . , including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible.").  Where Plaintiff disagrees with Defendants' characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) ("In ruling on a motion for summary judgment, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.").  While the Court is entitled to rely on "pleadings, the discovery and disclosure materials on file,

The Savings Plan is a "participant-directed, defined contribution, pension plan that allows participants to control the investment of their accounts by choosing among a broad range of investment alternatives," including target date funds and individual asset class investment options, such as the Global Opportunity Fund. (Id. ¶¶ 27, 32)

On January 1, 2007 – after Verizon Investment's favorable recommendation and the Benefit Committee's approval – the Global Opportunity Fund became a Savings Plan investment option. (Id. ¶¶ 33-34) The addition of the Global Opportunity Fund as an investment

---

and any . . . affidavits" under Fed. R. Civ. P. 56, it has considered only evidence that would be admissible at trial. See Feingold v. New York, 366 F.3d 138, 155 n.17 (2d Cir. 2004).

In responding to Defendants' Local Rule 56.1 statement and in asserting facts in her counterstatement, Plaintiff frequently disputes Defendants' factual assertions – and makes factual assertions of her own – without providing supporting citations to the record. (See Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶¶ 14, 27, 32, 46-47, 49-50, 54-55, 64, 76, 85, 95, 98, 100, 102-05, 107-10, 115-18, 129, 151-54, 158, 164-67, 174-79, 193-97, 199, 204, 208, 213, 215, 217-18, 220, 222-28, 235, 280, 289, 291, 297, 299, 307, 322, 348, 354, 358, 362, 366-67, 378, 384, 389, 391, 412, 414-16, 418-19, 422, 433, 439, 445) In such circumstances, this Court has disregarded Plaintiff's factual assertions. Moreover, "any of [Defendants'] Rule 56.1 Statements that [Plaintiff] do[es] not specifically deny – with citations to supporting evidence – are deemed admitted for purposes of [Defendants'] summary judgment motion." Ezagui v. City of New York, 726 F. Supp. 2d 275, 285 n.8 (S.D.N.Y. 2010). "Local Rule 56.1 clearly states that the moving party's 56.1 statement 'will be deemed to be admitted unless controverted,' and requires that such denials be supported by a specific citation to admissible evidence." Universal Calvary Church v. City of New York, No. 96 Civ. 4606 (RPP), 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000) (citations omitted) (quoting Local Civ. R. 56.1(c); citing Local Civ. R. 56.1(d)). And where "the record does not support the assertions in a Local Rule 56.1 statement, those assertions [have been] disregarded and the record reviewed independently." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001).

In responding to Defendants' Local Rule 56.1 statement and in her counterstatement, Plaintiff also frequently makes legal arguments without specifically controverting Defendants' factual statements. (See Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶¶ 2, 18, 21, 27, 32, 46-47, 49-50, 54-55, 82, 90, 95, 156-58, 164, 190, 211, 213, 215, 217, 219, 236, 274-75, 278, 291, 304) "Such legal arguments and assertions have no place in a Rule 56.1 statement and have not been considered by the Court." Creighton v. City of New York, No. 12 Civ. 7454 (PGG), 2017 WL 636415, at *5 n.11 (S.D.N.Y. Feb. 14, 2017) (collecting cases).

Defendants' motion to strike (Dkt. No. 177) is thus granted as set forth above.

option was "part of a comprehensive redesign of the [Savings] Plan's investment menu that was intended to give [Savings] Plan participants access to investment return strategies that were used for many years in Verizon's defined benefit pension plans."  (Id. ¶ 35)

The Global Opportunity Fund was part of a "'diversified approach to investing . . . in a fund of funds approach.'"  (Id. ¶ 36 (quoting Taylor Decl., Ex. 86 (Dkt. No. 190-86) at 8; id., Ex. 4 (Dkt. No. 190-4) at 12))  The Global Opportunity Fund was initially composed of 10% Goldman Sachs Total Refund Offshore ("Goldman Sachs Offshore"), 20% Bridgewater Pure Alpha Fund II, 32% Mellon Capital Global Alpha Strategy ("Mellon Global"), and 38% cash managed by Mellon Capital.  (Id. ¶¶ 38, 229)  These funds each used the Global Tactical Asset Allocation investment strategy, which "'seeks to add value, relative to its benchmark, by investing in the most attractive markets on a global basis, while simultaneously underweighting, or shorting, markets that are viewed by the fund managers as overvalued.'"  (Id. ¶¶ 39-40 (quoting Taylor Decl., Ex. 86 (Dkt. No. 190-86) at 8))

Over a ten-year period between 1996 and 2006, Mellon Global had an annualized return of 25.2%, with one year of negative results.  (Id. ¶¶ 44-45)  Over a ten-year period between 1996 and 2006, Goldman Sachs Offshore had an annualized return of 33.8%, with two years of negative results.  (Id. ¶ 48)  Over fifteen years between 1991 and 2006, Bridgewater Pure Alpha Fund II had an annualized return of 17.5%, with three years of negative results.  (Id. ¶ 52)  Verizon Investment "backtested" these funds with a cash component "'to provide a profile of the new funds' historical risk and return characteristics' prior to [Verizon Investment]'s recommending the addition of the Global Opportunity Fund."  (Id. ¶ 58 (quoting Taylor Decl., Ex. 86 (Dkt. No. 190-86) at 9))  The "backtest" showed – over ten years – annual returns ranging from 7.38% to 39.12%, with one year of negative results. (Id. ¶ 59)

The Global Opportunity Fund had a fixed annual fee, because each of the underlying funds is managed by a hedge fund.  (Id. ¶¶ 62-63)  For 2007, the estimated annual fee for the Global Opportunity Fund was 197.7 basis points.  (Id. ¶ 61)  From 2007 to 2017, the estimated annual fee ranged from 106.7 basis points, to 199.9 basis points.  (Id. ¶ 83)

Savings Plan participants were only permitted to allocate up to 15% of their contributions to the Global Opportunity Fund, and they were prohibited from investing in the Global Opportunity Fund if their balances in that fund represented 15% or more of their total Savings Plan balance.  (Id. ¶ 69)  These limits were imposed due to "'potential volatility'" in the Global Opportunity Fund.  (Id. ¶ 71 (quoting Taylor Decl., Ex. 86 (Dkt. No. 190-86) at 7))

The Global Opportunity Fund had a target rate of return that it shared with Savings Plan participants.  The initial target rate of return – or "hurdle rate" – was 12%.  (Id. ¶ 65)  The hurdle rate is a "'target percentage for an increase in a fund's value each year,'" but is "'neither a guarantee nor a prediction of how the Fund [will] actually perform.'"  (Id. ¶¶ 66-67 (quoting Taylor Decl., Ex. 4 (Dkt. No. 190-4) at 7, 13))  Moreover, the hurdle rate was intended as a target rate of return for the performance of the Global Opportunity Fund "'over an entire market cycle.'"  (Id. ¶ 68 (quoting Taylor Decl., Ex. 123 (Dkt. No. 190-124) at 9))

Target date funds were added to the Savings Plan as investment options at the same time that the Global Opportunity Fund was added as an investment option.  (Id. ¶ 94)  Both changes were part of the Benefits Committee's efforts to provide a greater range of investment options to Savings Plan participants.  (Id.)

The target date funds were designed as "'single investment options that are professionally managed to give participants an appropriate combination of equity, bond and other investments based on the time they plan to begin withdrawing their savings.'"  (Id. ¶ 96

(quoting Taylor Decl., Ex. 4 (Dkt. No. 190-4) at 4))  For Savings Plan participants with a longer

time horizon to retirement, the target date funds invested more heavily in funds that offered

historically higher returns and higher risks; for Savings Plan participants with a shorter horizon

to retirement, the target date funds invested more heavily in less volatile investments.  (Id. ¶ 97)

The Target Date Fund Manager determined the investments offered in the target

date funds.  (Id. ¶ 98)  In 2007, Verizon Investment appointed Russell Implementation Services

Inc. ("Russell") as the Target Date Fund Manager for the Saving Plan's target date funds.  (Id. ¶

99)  According to the Strategic Investment Program Agreement entered into by Verizon

Investment and Russell, Russell was "solely responsible for the management and design of the

glide path for each of the [target date funds]."  (Id. ¶ 100)  In that role, Russell was a fiduciary of

the Savings Plan for purposes of ERISA.  (Id. ¶ 101)

### B.      Defendants' Oversight of the Global Opportunity Fund

Verizon provided Savings Plan participants with a Summary Plan Description

("SPD") that describes the Savings Plan's enrollment, contributions, matching contributions, and

eligibility.  (Id. ¶ 77)  The SPD includes the Investment Options Guide, which "describe[s] the

available investment options"; "disclose[s] the [Global Opportunity] Fund's investment

managers and their target percentages in the investment options"; "describe[s] what the Global

Opportunity Fund is, the Fund's investment goals, and the Fund's investment risks"; "disclose[s]

to participants what the [target date funds] are, the [target date funds'] risks, the composition of

the [target date funds]; and the [target date funds'] investment goals"; "disclose[s] the Fund's

estimated annual expense ratio to participants"; and "provide[s] the expense ratios for each of the

[target date funds]."  (Id. ¶¶ 78-84)

The Investment Options Guide presents the performance and the historical benchmark returns of the Global Opportunity Fund and the target date funds for each year, as well as annualized returns for one year, three years, five years, ten years, and since inception. (Id. ¶¶ 85-86)  The funds' best twelve-month period and worst twelve-month period are also disclosed.  (Id.)  Since 2012, Savings Plan participants have also received annual disclosures regarding the Global Opportunity Fund's fee and performance at one-year, five-year, and ten-year intervals, as compared to its hurdle rate and as compared to the Citigroup 3-Month Treasury Bill Index.  (Id. ¶¶ 87-88)

Verizon Investment was responsible for monitoring and allocating the assets of the Global Opportunity Fund among the investment managers that it selected, and for making changes to the Global Opportunity Fund as "'it saw fit.'"  (Id. ¶ 150 (quoting Taylor Decl., Ex. 127 (Dkt. No. 190-128) at 11))  Verizon Investment "maintained detailed written policies and procedures for monitoring and managing investments in the [Savings] Plan"; "monitored the Global Opportunity Fund's portfolio and its performance on a daily, weekly, monthly, and quarterly basis"; "analyzed reports regarding the [Global Opportunity] Fund's assets, such as exposure reports and executive summary risk reports[] provided by the Fund's investment managers"; and maintained contact with the Global Opportunity Fund's investment managers, including at semi-annual in-person meetings at which the Global Opportunity Fund's component funds were discussed.  (Id. ¶¶ 151-54)

The Benefits Committee was responsible for selecting the Global Opportunity Fund and other investment options in the Savings Plan, and had the authority to add and eliminate Savings Plan investment options.  (Id. ¶¶ 155-56)  The Benefits Committee met at least annually – as well as on an ad hoc basis as needed – to review Savings Plan funds' investment

performance and other matters.  (Id. ¶¶ 157-58)  Verizon Investment employees attended

Benefits Committee meetings and made presentations concerning the performance of the

investment options in the Savings Plan and their monitoring of the investment managers.  (Id. ¶¶

160, 164)  These meetings were "robust" and involved "rigorous questioning" of Verizon

Investment employees regarding underperforming funds.  (Id. ¶¶ 164, 166)

       The Defined Contribution Executive Committee (the "Executive Committee")

typically met quarterly with Verizon Investment personnel to review the Savings Plan's

investment options.  (Id. ¶¶ 170-71)  In advance of each scheduled meeting, detailed materials

relating to the performance of the Savings Plan's investment options were circulated to the

attendees for review, including updates on the market generally, the investment options' asset

allocations, and employee participation rates.  (Id. ¶¶ 172-73)  At the meetings, Verizon

Investment personnel presented quarterly investment results for all of the Savings Plan's

investment options, including the Global Opportunity Fund, and the meetings involved "robust

discussion" of investment performance, "with a special focus on underperforming funds."  (Id.

¶¶ 174-75)

       Verizon Investment monitored the fees associated with each Savings Plan

investment option, including through peer comparisons, and made presentations concerning fees

to the Benefits Committee and the Executive Committee.  (Id. ¶¶ 177-79)  Verizon Investment

also hired an independent third party – CEM – to conduct the peer comparisons.  (Id. ¶ 180)  On

an annual basis, CEM collected asset and fee levels for the investment options in the Savings

Plan, consolidated the results, and provided the results to Verizon Investment, which then

reviewed the reports.  (Id. ¶¶ 181-82)  In connection with CEM's peer comparisons, Verizon

Investment personnel had annual calls with CEM regarding CEM's process and the data Verizon

Investment provided to CEM.  (Id. ¶ 187)  The CEM reports show that, for most years, the fees associated with the Global Opportunity Fund were similar to those of its peers.  (Id. ¶ 188)

Verizon Investment also hired third party consultants – Fidelity, Wilshire, Blackrock, and Towers Watson – to analyze the Savings Plan's investment options' fees and performance.  (Id. ¶ 189)  In March 2014, Wilshire delivered a report to Verizon, which shows that the Global Opportunity Fund "'ranked in the [fourth] quartile,'" across the one-, three-, and five-year time periods.  (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶ 356 (quoting Bloom Decl., Ex. 23 – Part II (Dkt. No. 194-25) at 6))  Wilshire's report also states that the Global Opportunity Fund "'falls into the Lipper category of "Global Flexible Portfolio Funds," which encompasses many multi-asset class funds but with varying allocations which may account for the lower quartile ranking.'"  (Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶ 356 (emphasis omitted) (quoting Bloom Decl., Ex. 23 – Part II (Dkt. No. 194-25) at 6))

Verizon Investment has a written policy that sets forth "'the process and the procedures for monitoring' investment managers," including the Global Opportunity Fund's investment managers.  (Def. R. 56.1 Stmt. (Dkt. No. 182) ¶ 190 (quoting Taylor Decl., Ex. 116 (Dkt. No. 190-117) at 37))  The policy states that Verizon Investment has proprietary software called Statistical Tracking and Reporting ("STAR") that allows it "'to utilize the monthly returns of an investment versus its associated benchmark to analyze a manager's performance, risk, and consistency over time,'" and that enables Verizon Investment to review "'the performance of investment managers in great detail by utilizing financial statistics and analytical data.'"  (Id. ¶¶ 191-92 (quoting Taylor Decl., Ex. 143 (Dkt. No. 190-144) at 6; Taylor Decl., Ex. 142 (Dkt. No. 190-143) at 3))  Verizon Investment analyzes performance and risk over time "'to assess whether a manager is meeting the assigned mandate objective'" (id. ¶ 193 (quoting Taylor Decl., Ex. 143

(Dkt. No. 190-144) at 6; Taylor Decl., Ex. 142 (Dkt. No. 190-143) at 3)), and generates and reviews STAR reports to monitor the performance of the investment managers serving Saving Plan participants.  (Id. ¶ 194)  Verizon Investment personnel also monitor investment managers through verbal contact, including by asking questions about market conditions and by maintaining a dialogue with the investment managers, such as those serving the Global Opportunity Fund.  (Id. ¶¶ 196-97)

In April 2012, Verizon Investment hired Rock Creek Group to manage and select the component funds and investment managers for the component funds within the Global Opportunity Fund.  (Id. ¶¶ 258, 263)  Verizon Investment monitored Rock Creek Group by analyzing and reviewing reports that Rock Creek Group provided concerning the performance of the funds offered through the Global Opportunity Fund.  (Id. ¶ 199)  Rock Creek Group provided risk reports that analyzed the investment strategies, allocations, concentrations, geographic and sector exposures, volatility, risk, diversification, and performance; quarterly market commentary, including commentary concerning the hedge fund industry; and monthly hedge fund strategy commentary.  (Id. ¶¶ 200-01, 204)

Verizon Investment also received monthly and quarterly performance and exposure reporting from Bridgewater – one of the Global Opportunity Fund's underlying investment managers – which included reports concerning geographic exposure, portfolio values, performance, and assets under management by class, as well as quarterly letters providing analysis of the investments, the global financial markets, and detailed analysis of global bonds, currencies, commodities, and developed equities.  (Id. ¶¶ 205-06)

Verizon Investment also monitored the performance of all of the Savings Plan's investment options.  (Id. ¶ 213)  It created and reviewed monthly performance reports – the

VIPER reports – concerning the investment managers and investment options, which analyzed the investment options and their component funds based on cumulative returns, variance from the benchmark, and benchmark performance at one-month, three-month, year-to-date, twelve-month intervals, and annualized, as well as variance from the benchmark and benchmark performance at three-year, five-year, and ten-year intervals.  (Id. ¶¶ 215-16)  Verizon Investment also used the STAR reports to monitor performance monthly.  (Id. ¶ 217)  Verizon Investment analyzed the returns of the Savings Plan's investment options, including the Global Opportunity Fund, at daily, monthly, and year-to-date intervals.  (Id. ¶ 220)

Verizon Investment also monitored the Global Opportunity Fund's performance using the HFRI Fund Weighted Composite Index.[2]  (Id. ¶ 219; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶¶ 219, 349; Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶ 349)

Verizon Investment reported on the Savings Plan's performance to the Benefits Committee, the Executive Committee, and Verizon's Chief Financial Officer.  (Def. R. 56.1 Stmt. (Dkt. No. 182) ¶¶ 222-24)  As part of the monitoring process, Verizon Investment also met with investment managers and monitored their monthly reports.  (Id. ¶ 228)

---

[2]  Plaintiff's expert – Cynthia L. Jones – describes the HFRI Fund Weighted Composite Index as follows:

The HFRI Fund Weighted Composite Index is a global, equal-weighted index of over 1,400 single-manager funds that report to HFR Database.  Constituent funds report monthly net of all fees performance in US Dollar and have a minimum of $50 Million under management or a twelve (12) month track record of active performance.  The HFRI Fund Weighted Composite Index does not include Funds of Hedge Funds.

(Bloom Decl., Ex. 19 ("Jones Report") (Dkt. No. 194-19) ¶ 28)

C.      **The Global Opportunity Fund's Performance**

Between 2007 and 2016, the Global Opportunity Fund's annualized net performance ranged from -10.32% to 13.88%, with negative returns in three years.  (Id. ¶ 72) The Global Opportunity Fund's net performance over the life of the fund remained negative from 2007 through 2009, and by the end of 2016, was 1.4%.  (Id.)

With respect to the Global Opportunity Fund's component funds, between 2007 and 2011, Mellon Global's annualized performance ranged from -39.87% to 31.58%.  (Id. ¶ 74) Between 2007 and 2009,[3] Goldman Sachs Offshore's annualized performance ranged from -53.41% to 2.05%.  (Id.)  Between 2007 and 2011, Bridgewater Pure Alpha Fund II's annualized performance ranged from 5.06% to 60.39%.  (Id.)  And between 2007 and 2011, the cash component of the Global Opportunity Fund managed by Mellon Capital had an annualized performance ranging from 0.21% to 5.41%.  (Id.)

1.      **Plaintiff's Experts' Evaluation of the
Global Opportunity Fund's Performance**

Plaintiff's expert Cynthia L. Jones analyzed the monthly and annual returns for the Global Opportunity Fund between 2007 and 2017, and concludes that on an annual basis the Fund underperformed – as compared to its "hurdle rate" – in every year during this period through December 31, 2016, except for 2010, and that, on a cumulative basis, the Global Opportunity Fund underperformed by 78.4%.  (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶¶ 339-40, 342)  She also concludes that the Global Opportunity Fund underperformed "by more than 20% in each of the first two years of the Fund's existence[,] and from inception through

---

[3]  Goldman Sachs Offshore was removed from the Global Opportunity Fund in April 2010. (Def. R. 56.1 Stmt. (Dkt. No. 182) ¶¶ 74, 230, 232)

December 31, 2009[,] by 47.6%." (Id. ¶¶ 340-41)  From 2007 to 2009, the Fund's annualized

return was -4.2%.  (Id. ¶ 364)

David J. Witz – Plaintiff's other expert – concludes that the Global Opportunity

Fund did not produce positive returns regardless of market conditions, between 2007 and 2009.

(Id. ¶ 365 (citing Bloom Decl., Ex. 18 ("Witz Report") (Dkt. No. 194-18) ¶ 49(c))

Jones compared the Global Opportunity Fund's performance with the HFRI Fund

Weighted Composite Index and concludes that, from the Fund's inception on January 1, 2007

through December 31, 2009, the Fund underperformed the HFRI benchmark by 22.7%, and that,

from the Fund's inception through December 31, 2016, the Fund underperformed the HFRI

benchmark by more than 23%.  (Id. ¶¶ 350-51)   The Global Opportunity Fund underperformed

the HFRI benchmark in 2007, 2009, 2012, 2013, 2014, and 2016.  (Id. ¶ 352)

Jones also cites to the "Sharpe Ratio" and the "Information Ratio."  (Id. ¶¶ 368-

69)  The Sharpe Ratio is an analytical method of comparing two portfolios "based on the unit of

reward an investor is likely to realize relative to the unit of risk [the investor] assumes."  (Id. ¶

368)  "The higher the Sharpe Ratio, the more reward an investor is likely to receive relative to

the risk [the investor] assumes."  (Id.)  The Information Ratio measures an investment manager's

"ability to outperform a benchmark, and the consistency of [the manager's] performance over

time."  (Id. ¶ 369)  The higher the Information Ratio, "the better the risk-adjusted performance."

(Id.)

Verizon Investment's STAR reports reflect Sharpe Ratios and Information Ratios

for the Global Opportunity Fund.  (Id. ¶ 370)  According to Jones, the STAR reports show that,

as of March 31, 2010, the Global Opportunity Fund's Sharpe Ratio and Information Ratio

were -0.69 and -1.86, respectively, indicating that the Fund's return was below that of a risk-free

asset, and that the Fund was not generating any excess return relative to its benchmark. (Id. ¶ 373) Similarly, Witz states that the STAR reports show that, as of December 31, 2009, the Global Opportunity Fund's Sharpe Ratio and Information Ratio were -0.67 and -1.83, respectively. (Id. ¶ 375)

Jones also cites to the Cumulative Sum Information Ratio Alarm ("CUSUM Alarm"), which is another measure of risk-adjusted performance. (Id. ¶ 386) The CUSUM Alarm tracks changes in manager or fund performance relative to a designated benchmark, as calculated by the Information Ratio, over time. (Id.) Verizon Investment tracked the CUSUM Alarm in the monthly STAR reports. (Id.) According to Jones, the CUSUM Alarm reports regarding the Global Opportunity Fund were "undesirable, indicating that a fund or investment manager had a higher probability of underperforming the predetermined benchmark based on past performance." (Id.) Jones further notes that – by the end of 2008 – the Global Opportunity Fund had registered four CUSUM Alarms. (Id. ¶ 387) According to Jones, the Global Opportunity Fund triggered more CUSUM Alarms between 2008 and 2016 than any other Savings Plan investment option. (Id. ¶¶ 387-88)

Based on Witz's review of the Global Opportunity Fund's performance between January 1, 2007 and December 21, 2009, he states that "there is no reason why the Global Opportunity Fund was not removed [as a Savings Plan investment option] by the first quarter of 2010 at the latest." (Witz Report (Dkt. No. 194-18) ¶ 50)

### 2. Defendant's Expert's Evaluation of the Global Opportunity Fund's Performance

Defendants' expert Daniel R. Fischel was asked "to analyze [Plaintiff's] claims from an economic perspective." (Taylor Decl., Ex. 272 ("Fischel Report") (Dkt. No. 190-274) ¶ 9) He "conclude[s] that Plaintiff's analysis of the performance of the Global Opportunity Fund

is fundamentally flawed and that the economic evidence does not support Plaintiff's claims that the Fund had poor performance nor that the Fund had 'dramatic and persistent underperformance.'"  (Id. ¶ 10)  Fischel further "discusses appropriate methodologies for evaluating performance and shows that the properly interpreted economic evidence does not support Plaintiff's claims."  (Id.)

Fischel opines that the Sharpe Ratio and the Information Ratio are not proper measures of the Global Opportunity Fund's investment strategy.  (Bloom Decl., Ex. 46 ("Fischel Rebuttal") (Dkt. No. 194-60) ¶¶ 23-28)  According to Fischel, "the Sharpe Ratio is only an appropriate way to evaluate a portfolio's performance when that portfolio is the investor's entire investment strategy" (id. ¶ 24), and here Savings Plan participants were not permitted to invest all of their Savings Plan assets in the Global Opportunity Fund.  (Def. R. 56.1 Stmt. (Dkt. No. 182) ¶ 69)

Fischel also opines that the Fund cannot be evaluated using the Information Ratio because "the hurdle rate is not a benchmark index."  (Fischel Rebuttal (Dkt. No. 194-60) ¶ 27)  Defendants also note that the historical Information Ratios for the Global Opportunity Fund's component funds ranged from 0.86 to 1.8 prior to their inclusion in the Global Opportunity Fund (Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶ 374), and that data presented by Verizon Investment to the Executive Committee between May 14, 2010 and April 26, 2013 shows that the Global Opportunity Fund's Information Ratio – although still below zero – increased and thus improved after April 1, 2010.  (Id. ¶ 377)

Fischel also explains that a portfolio's beta "measures the systemic risk of the portfolio," with a beta less than one indicating that "the investment portfolio has less systemic risk than the market portfolio," while a beta greater than one indicates that "the investment

portfolio has more systemic risk than the market portfolio." (Fischel Report (Dkt. No. 190-274) ¶ 28 & n.47) Between 2010 and 2012, Verizon Investment reported to the Executive Committee that the Global Opportunity Fund had a beta ranging from 1799.31 to 2582.40. (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶ 381) However, the STAR reports and Executive Committee materials in 2012 show lower betas, ranging from 1.33 to 3.13. (Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶ 381)

      **D.**      **Defendants' Actions Concerning the Global**
                   **<u>Opportunity Fund Between 2010 and 2017</u>**

          In early 2010, Verizon Investment decided to remove Goldman Sachs Offshore from the Global Opportunity Fund. (Def. R. 56.1 Stmt. (Dkt. No. 182) ¶ 230) This decision was made based on Goldman Sachs Offshore's "performance . . . over the one- and three-year time periods, 'as well as key personnel turnover within Goldman Sachs.'" (<u>Id.</u> (quoting Taylor Decl., Ex. 221 (Dkt. No. 190-223) at 2)) Before Verizon Investment communicated this decision to Goldman Sachs, however, Goldman Sachs closed Goldman Sachs Offshore, effective April 1, 2010. (<u>Id.</u> ¶¶ 231-32) Verizon Investment allocated the 10% of the Global Opportunity Fund that had previously been allocated to Goldman Sachs Offshore to cash, raising the cash allocation in the Global Opportunity Fund from 38% to 48%, and decreasing the Fund's fees. (<u>Id.</u> ¶¶ 233, 235)

          In March 2010, Verizon Investment began searching for a replacement for the Goldman Sachs Offshore component of the Global Opportunity Fund. (<u>Id.</u> ¶ 236) At that time, "the universe of 'institutional quality [Global Tactical Asset Allocation] managers' was small," which made it difficult to identify a wide range of prospective funds. (<u>Id.</u> ¶ 238 (quoting Taylor Decl., Ex. 227 (Dkt. No. 190-229) at 3)) Accordingly, Verizon Investment expanded its search

to include "'all managers investing globally across asset classes.'"  (Id. ¶ 239 (quoting Taylor Decl., Ex. 227 (Dkt. No. 190-229) at 3))

By November 2010, Verizon Investment had identified several potential replacements for the Goldman Sachs Offshore component, and it began analyzing each of the potential funds against the then-existing Global Opportunity Fund portfolio to identify which of the proposed funds best complemented the Global Opportunity Fund portfolio.  (Id. ¶¶ 240-41)  In conducting this search, Verizon Investment had three non-negotiable criteria for inclusion in the Global Opportunity Fund:  monthly liquidity with three days' notice of flows, daily pricing, and a flat fee.  (Id. ¶ 245)  These criteria narrowed the list of potential replacements.  (Id. ¶ 246)

In conducting its search, Verizon Investment had on-site meetings and conference calls with all of the finalists, and performed "extensive qualitative and quantitative analyses to 'identify the best manager(s) to improve [the Global Opportunity Fund's] overall performance and diversify the two remaining managers in the Fund.'"  (Id. ¶¶ 247-48 (quoting Taylor Decl., Ex. 228 (Dkt. No. 190-230) at 4; Taylor Decl., Ex. 230 (Dkt. No. 190-232) at 4))

Verizon Investment continued its search from March 2010 through January 2012. (Id. ¶¶ 236-53)  In February 2012, it made a recommendation to the Executive Committee, identifying three managers that offered the best potential diversification benefit to the Fund.  (Id. ¶ 254)  Verizon Investment ultimately determined, however, that it could not proceed with its recommendation because one of the potential managers demanded that Verizon Investment select all of the counterparties for the Global Opportunity Fund's investments.  (Id. ¶¶ 255-57) Verizon Investment then began to consider whether an investment manager should be hired to manage the underlying funds in the Global Opportunity Fund.  (Id. ¶ 258)

In April 2012, Verizon Investment hired the Rock Creek Group to oversee the Global Opportunity Fund and select and manage the investment managers of the Global Opportunity Fund's component funds.  (Id. ¶¶ 258-59, 263)  Rock Creek Group represented to Verizon Investment that it "'ha[d] been investing globally in hedge funds since the early 1990[]s,'" its "'principals managed $65 billion in traditional and alternative asset classes for a client base that included central banks, pension plans, endowments and foundations, and sovereign wealth funds,'" and that it had a "'historically stable 100% institutional client base.'" (Id. ¶¶ 260-61 (quoting Taylor Decl., Ex. 241 (Dkt. No. 190-243) at 4, 10))  Rock Creek Group had also served as a fund manager for Verizon's defined benefit plan.  (Id. ¶ 264)

At this same time, Verizon Investment considered whether the investment management of the Global Opportunity Fund should be restructured, with new investment managers brought into the Global Opportunity Fund as component funds, which Rock Creek Group would oversee.  In this regard, Verizon Investment "analyz[ed] . . . potential investment managers' reputation[s], the firms' capabilities, team continuity, the firms' management department[s], the firms' decision making process[es], the firms' reporting structure[s], the firms' decision makers, and the firms' research capabilities"; "the potential funds' performance[s], returns, drawdown, and volatility"; "how the potential investment manager[s] fit into the portfolio"; and "whether [the potential investment managers'] addition into the Fund would add diversification to the Fund's portfolio and complement the other investment managers in the Fund."  (Id. ¶¶ 265-67)

In May 2012, Verizon Investment recommended to the Executive Committee that the Global Opportunity Fund be restructured as follows:  a two-manager configuration, with a manager retained "'to provide actively managed global macro alpha-generating capabilities and

risk management and operational oversight for the fund-of-fund portfolio,'" while another manager would oversee a "'highly liquid, risk-balanced hedge fund strategy providing diversified exposure to a portfolio of global asset class risk premiums.'"  (Id. ¶¶ 268-69 (quoting Taylor Decl., Ex. 244 (Dkt. No. 190-246) at 2))  Verizon Investment recommended that Rock Creek Group be the manager of the fund-of-fund component of the Global Opportunity Fund, while the second component of the Fund would be allocated to Bridgewater's All Weather III strategy, which Verizon Investment would itself oversee.  (Id. ¶ 271)  As of February 2012, Bridgewater's All Weather III hedge fund was ranked seventh out of 100 top-performing hedge funds in Bloomberg Market's 100 Richest Funds.  (Id. ¶ 272)  In May 2012, Verizon Investment also reported to the Executive Committee that the estimated fee for the changes to the Global Opportunity Fund would be 196 basis points.  (Id. ¶¶ 274-75)

On August 1, 2012, and with the Executive Committee's approval, Verizon Investment restructured the Global Opportunity Fund, allocating 30% of its assets to Bridgewater's All Weather III hedge fund, and 70% of its assets to a fund of funds overseen by Rock Creek Group.  (Id. ¶ 276)  Rock Creek Group, Bridgewater, and the investment managers and submanagers of each of the component funds in the Global Opportunity Fund served as ERISA fiduciaries.  (Id. ¶¶ 262, 277, 282)

For the component of the Global Opportunity Fund that it managed, Rock Creek Group maintained the Fund's investments in Mellon Global, Bridgewater Pure Alpha Fund II, and cash, and added investments in two additional funds – Grantham, Mayo Van Otterloo & Co., and the Aspect Diversified Fund.  (Id. ¶ 278)  The Global Opportunity Fund's hurdle rate was reduced from 12% to 8%, effective August 1, 2012, due to changes in "'capital market return assumptions.'"  (Id. ¶¶ 280-81 (quoting Taylor Decl., Ex. 23 (Dkt. No. 190-23) at 3))

In August 2012, Russell reduced the allocations in the target date funds to the Global Opportunity Fund.  (Id. ¶ 115)

In December 2013, Rock Creek Group added Western Asset Macro Opportunities as a component to the Global Opportunity Fund, and reduced the allocation to Mellon Global. (Id. ¶¶ 284-85)  These changes were expected to decrease the Fund's fees from 194 to 171 basis points.  (Id. ¶ 286)  As of December 2014, Rock Creek Group removed Grantham, May Van Otterloo & Co. and the Aspect Diversified Fund as components of the Global Opportunity Fund. (Id. ¶ 288)

As of January 1, 2015, Verizon Investment reduced the Global Opportunity Fund's allocation to the Bridgewater All Weather III fund to 20%, and increased the allocation to Rock Creek Group to 80%.  (Id. ¶ 290)  Verizon Investment also changed the Global Opportunity Fund's hurdle rate from 8% to an adjustable rate of LIBOR +4%.  (Id. ¶ 291)  Rock Creek Group added investments in the Chilton Flagship Strategy and AQR Managed Futures Strategy to align with the Global Opportunity Fund's new hurdle rate.  (Id. ¶ 292)  The Rock Creek Group component of the Global Opportunity Fund thus consisted of the Chilton Flagship Strategy, Bridgewater Pure Alpha Fund II, Western Asset Macro Opportunities, Mellon Global, AQR Managed Futures Strategy, and cash.  (Id. ¶ 293)

Effective January 1, 2015, Russell reduced the Global Opportunity Fund allocations in the target date funds to between 2% and 5% of total assets.  (Id. ¶ 117)

In February 2015, Rock Creek Group added investments in an additional fund – the Rock Creek Series, and in May 2015, it added investments in another fund – Sirios.  (Id. ¶¶ 294, 296)  Verizon Investment and Rock Creek Group reduced the fees of the Global Opportunity Fund from 199.9 basis points in 2013 to 106.7 basis points in 2015.  (Id. ¶ 295)

Effective January 4, 2016, Verizon Investment hired J.P. Morgan Investment Management ("J.P. Morgan") to replace Russell as the Target Date Manager for the target date funds.  (Id. ¶ 119)  That same day, J.P. Morgan further reduced the Global Opportunity Fund allocations in the target date funds, and eliminated the Global Opportunity Fund as an investment option for certain of the target date funds.  (Id. ¶ 121)

On August 10, 2016, Verizon Investment recommended to the Benefits Committee that the Global Opportunity Fund be frozen.  (Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶ 392)  On February 1, 2017, the Benefits Committee eliminated the Global Opportunity Fund as a stand-alone investment option in the Savings Plan.  (Def. R. 56.1 Stmt. (Dkt. No. 182) ¶¶ 122, 297)  The Benefits Committee took this action in part because (1) J.P. Morgan "planned to eliminate the Global Opportunity Fund [as an investment option] from the [target date funds]"; (2) only a "small number of [Savings Plan] participants [were] investing directly in the [Global Opportunity Fund]"; and (3) "maintaining the [Global Opportunity Fund]'s derivative strategies with a reduced asset base" was difficult and costly.  (Id. ¶¶ 123, 298)

On October 16, 2018, Verizon Investment notified Rock Creek Group that it would be terminating Rock Creek Group's position as an investment manager effective November 30, 2018, because of the restructuring of the target date funds by J.P. Morgan, the Global Opportunity Fund's lack of diversification benefit, and fee considerations.  (Id. ¶¶ 300-02)

## II.   PROCEDURAL HISTORY

The Complaint was filed on February 11, 2016, and asserts three breach of fiduciary duty claims:  (1) that Defendants breached the fiduciary duty of prudence with respect to the Target Date Funds due to "Defendants' appointment of fiduciaries, design of the [Target

Date Funds] and the underlying custom funds, and monitoring of the performance of and fees charged by the various managers of those funds"; (2) that Defendants breached the fiduciary duty of prudence with respect to the Global Opportunity Fund by "fail[ing] to adequately monitor the performance of the Global Opportunity Fund and . . . fail[ing] to take any corrective action regarding that fund despite obvious and long-term underperformance"; and (3) that Defendants breached the fiduciary duty to provide "detailed plan-related and investment-related information annually in the form of the Participant Fee Disclosure," by "deliver[ing] false and misleading information regarding its direct and indirect compensation for purposes of the filing the Verizon Plans' Annual Return on Form 5500" and "fail[ing] to disclose [their] compensation in any meaningful manner."  (Cmplt. (Dkt. No. 1) ¶¶ 114-35)

On October 25, 2016, Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  (Def. Mot. (Dkt. No. 57))

In a September 28, 2017 order, this Court granted Defendants' motion as to Plaintiff's breach of fiduciary duty claims concerning the target date funds and investment-related disclosures.  (Sept. 28, 2017 Order (Dkt. No. 70) at 9-14, 19-29)  With respect to Plaintiff's claim regarding the target date funds, this Court concluded that "Plaintiff's conclusory allegations that the [Savings] Plans' offerings were 'overly complex, overly risky, and inappropriate for the average Verizon employee' are not sufficient."  (Id. at 14 (citation omitted) (quoting Cmplt. (Dkt. No. 1) ¶¶ 9, 119))  With respect to the investment-related disclosures, this Court concluded that Plaintiff had not pled facts demonstrating that Defendants had (1) violated the Participant Fee Disclosure Rule; or (2) breached their fiduciary duties by failing to disclose information in, or making misrepresentations in, a Form 5500.  (Id. at 23-29)

This Court denied Defendants' motion to dismiss as to Plaintiff's claim that Defendants had not prudently monitored the Global Opportunity Fund and taken necessary corrective action with respect to that fund.  (Id. at 14, 17-18)  As to this assertion, this Court concluded that the Complaint contains sufficient factual allegations to state a claim.  (Id. at 18)  In this regard, this Court noted that the Complaint alleged that the Defendants "kept – as a 'core asset' of most of the [Savings] Plans' investment options – a fund that had wildly underperformed its benchmark over a ten-year period," and that, despite its "poor performance," the Global Opportunity Fund "featured an expense ratio higher than any other investment option available to [Savings] Plan participants."  (Id.)

On November 12, 2019, Plaintiff moved to certify a class based on her remaining claim.  (Pltf. Mot. (Dkt. No. 142))  On June 1, 2020, Judge Lehrburger issued a thirty-one-page Report and Recommendation ("R&R"), recommending that Plaintiff's motion for class certification and appointment of class counsel be granted.  (R&R (Dkt. No. 158) at 30-31)  On September 29, 2020, this Court adopted Judge Lehrburger's R&R in its entirety.  (Sept. 29, 2020 Order (Dkt. No. 163) at 19)

That same day, this Court issued a briefing schedule concerning Defendants' motion for summary judgment.  (Sept. 29, 2020 Order (Dkt. No. 164))  On March 26, 2021, Defendants moved for summary judgment; for an order striking portions of Plaintiff's summary judgment opposition papers; for an order excluding evidence from Plaintiff's experts; and to strike Plaintiff's jury demand.  (See (Dkt. Nos. 171, 173, 177, 180))

<u>**DISCUSSION**</u>

I.    <u>**LEGAL STANDARDS**</u>

    A.    <u>**Admissibility of Expert Testimony**</u>

        Federal Rule of Evidence 702 makes admissible testimony from an expert who is

qualified "by knowledge, skill, experience, training, or education" where

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

        Rule 702 assigns to the Court "'the task of ensuring that an expert's testimony

both rests on a reliable foundation and is relevant to the task at hand.'" <u>United States v.</u>

<u>Williams</u>, 506 F.3d 151, 160 (2d Cir. 2007) (quoting <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509

U.S. 579, 597 (1993)).

> <u>Daubert</u> enumerated a list of factors that, while not constituting a "definitive checklist or test," a district court might consider in evaluating whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation.

<u>Nimely v. City of New York</u>, 414 F.3d 381, 396 (2d Cir. 2005) (citing <u>Daubert</u>, 509 U.S. at 593-

94).

        In considering the reliability of the expert testimony, "the district court should

undertake a rigorous examination of the facts on which the expert relies, the method by which

the expert draws an opinion from those facts, and how the expert applies the facts and methods to

the case at hand." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir. 2002).

"[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only

serious flaws in reasoning or methodology will warrant exclusion." In re Fosamax Prod. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing Amorgianos, 303 F.3d at 267). Otherwise, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

**B.   Summary Judgment**

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).  "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting

Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, "'[a] party may not rely on

mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment. . . .  [M]ere conclusory allegations or denials . . . cannot by themselves

create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593

F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v.

Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

## II.   ANALYSIS

### A.   Motion to Exclude Plaintiff's Experts[4]

Defendants contend that this Court should exclude the opinions offered by

Plaintiff's expert witnesses, Cynthia L Jones and David J. Witz.  (Def. Br. (Dkt. No. 174) at 10-

26)

As to Jones, Defendants argue that her damages calculations are "unreliable"

because she did not make the required comparison between the Global Opportunity Fund's

actual performance and the performance that would have resulted had Plaintiff's contributions to

the Savings Plan been invested in more appropriate investment options during the same time

period.  (Id. at 20-24)  Defendants also complain that Jones' methodology is inconsistent with

the facts and controlling law.  (Id. at 24-26)

As to Witz, Defendants complain that he "has no relevant experience regarding

investments similar to the [Global Opportunity Fund]"; his opinion that "the removal of a fund

with 'sub-par performance' for 'twelve quarters' is 'standard protocol' is both unreliable and

---

[4]  While Defendants style their motion as a motion in limine, no trial date has been set in this
case, and the Court has not set a schedule for motions in limine.  The Court has thus construed
Defendants' "motion in limine" as a motion to preclude consideration of Plaintiff's experts'
opinions both at summary judgment and at trial.

unsupported; his proffered opinions are "unreliable because[,] in applying his manufactured rule[,] he ignored the objective facts"; and his opinions "do not relate to any of the[] issues [in the case]" and "are unhelpful and do not support either of Plaintiff's burdens in this case."  (Id. at 10-19)

        1.      **Cynthia L. Jones**

        Cynthia L. Jones is a vice president of Monument Economics Group, LLC, which is an economic consulting firm.  (Jones Report (Dkt. No. 194-19) ¶ 1)  She has a bachelor's degree in economics and business management from Rutgers University and a master's degree in business administration with a concentration in finance from Rutgers University.  (Id. ¶ 4)  She "ha[s] been professionally active as a financial analyst for more than twenty-five years[,] [and is a] . . . Chartered Financial Analyst ('CFA')."  (Id. ¶ 5)  "The past 25 years of [her] career have largely been dedicated to capital markets consulting and expert analytics in securities and commercial litigation matters, including valuation and economic damages."  (Id. ¶ 6)  She has also "been retained to provide opinions on the value of equity securities, corporate debt securities, mutual funds, real estate investment trusts, and other financial instruments[,] [and] . . . ha[s] been qualified to testify on matters including market efficiency, materiality, causation and damages."  (Id.)

        In her report, Jones (1) "[a]nalyze[s] the performance, risks, and fees associated with an investment in the Global Opportunity Fund as part of the [Savings] Plan during the [period between the Fund's inception on January 1, 2007 through the end of 2009, and also from inception through January 31, 2017]"; (2) "[d]etermine[s] whether a common damages methodology could be utilized to calculate potential losses to the [Savings] Plan and to compensate participants in the [Savings] Plan on a class-wide basis"; and (3) "[p]rovide[s] an

estimate of damages to the [Savings] Plan based on the assumption that[,] as of April 1, 2010, the

Global Opportunity Fund should have been removed as an investment option in the [Savings]

Plan."  (Id. ¶ 2)

Jones concludes that the Global Opportunity Fund performed poorly on a risk-

adjusted basis (id. ¶¶ 30-39); that the Global Opportunity Fund had the highest fees of any

Savings Plan investment option (id. ¶¶ 40-41); and that class-wide damages may be calculated

pursuant to a common methodology.  (Id. ¶¶ 42-45)  According to Jones,

> [d]amages sustained by the [Savings] Plan can be calculated using the historical
> monthly returns data for the Global Opportunity Fund, the dollar value of
> investment in the [Global Opportunity] Fund during the relevant time period, the
> dollar value of investment in the [Savings] Plan's Equity funds[,] and the monthly
> returns to an Equity investment benchmark ("Equity Benchmark") consisting of
> the asset-weighted Equity fund options in the [Savings] Plan.

(Id. ¶ 46)

Defendants complain that Jones "did not calculate the performance that

'otherwise would have taken place' by comparison to an 'equally plausible' alternative

investment," pursuant to Donovan v. Bierwirth, 754 F.2d 1049 (2d Cir. 1985), but rather

"compared the performance of the [Global Opportunity] Fund – which [was] comprised of hedge

funds and cash – to the performance of a manufactured 'Equity Benchmark' – which was

comprised of hypothetical investments in equities."  (Def. Br. (Dkt. No. 174) at 21 (quoting

Donovan, 754 F.2d at 1056-57))

In Donovan, the Second Circuit provides guidance to district courts concerning

how loss is determined in an ERISA breach of fiduciary duty case:

> [I]n determining what the [ERISA] Plan would have earned had the funds been
> available for other Plan purposes, the district court should presume that the funds
> would have been treated like other funds being invested during the same period in
> proper transactions.  Where several alternative investment strategies were equally
> plausible, the court should presume that the funds would have been used in the
> most profitable of these.

28

Donovan, 754 F.2d at 1056.

In her report, Jones calculates Plaintiff's loss by reference to an Equity Benchmark, which "consist[s] of the asset-weighted Equity fund options in the [Savings] Plan." (Jones Report (Dkt. No. 194-19) ¶ 46)  In taking this approach, Jones notes that Plaintiff contends that, "if the Global Opportunity Fund had not been an investment option in the [Savings] Plan, [the funds invested in the Global Opportunity Fund] would have been invested in the Equity investment options in the [Savings] Plan."  (Id. ¶ 43)

Defendants have not disputed this point.  (Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶ 396 (quoting Bloom Decl., Ex. 3 (Dkt. No. 194-3) at 14) (second alteration in original) ("Defendants do not dispute that [a Verizon Investment employee] testified that '[i]f [the] Global Opportunity [Fund] hadn't been in the [Savings] [P]lan, [Verizon Investment] would have had more money geared towards equities.'"))  Defendants have also not offered evidence that Plaintiff's investment in the Global Opportunity Fund would not have been allocated to equities, or that Plaintiff's investment in the Global Opportunity Fund would likely have been allocated to a fund with a similar performance and similar fees to the Global Opportunity Fund.  See Donovan, 754 F.2d at 1056 ("Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these.  The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them.").  Accordingly, Defendants have not shown that Jones' opinion is inconsistent with Donovan or is otherwise unreliable.

Defendants further complain that Jones "failed to follow her stated methodology for manufacturing her Equity Benchmark and included investments that were never made

available to [Savings] Plan [participants]."  (Def. Br. (Dkt. No. 174) at 22)  Jones states,

however, that the Equity Benchmark "consist[s] of the asset-weighted Equity fund options in the

[Savings] Plan" and that, "[i]n developing the Equity Benchmark, [she] identified the different

Equity funds available to [Savings] Plan participants during the . . . [p]eriod [between April 1,

2010 and January 31, 2017], as set forth in the monthly VIPER reports."  (Jones Report (Dkt.

No. 194-19) ¶ 46)  The VIPER reports – the monthly performance reports of the investment

managers and investment options offered in the Savings Plan – address Savings Plan investment

options, including equity investments options.  (Def. R. 56.1 Stmt. (Dkt. No. 182) ¶¶ 215-16;

see, e.g., Taylor Decl., Exs. 201-08 (Dkt. Nos. 190-203, 190-204, 190-205, 190-206, 190-207,

190-208, 190-209, 190-210) (examples of VIPER reports))  Defendants have not explained why

it was improper for Jones – in constructing the Equity Benchmark – to use the VIPER reports to

"identif[y] the different Equity funds available to [Savings] Plan participants."  (Jones Report

(Dkt. No. 194-19) ¶ 46)

 Because Defendants have not demonstrated that Jones violated her own

methodology, or otherwise demonstrated that her opinions are unreliable, Defendants' motion to

exclude Jones' opinion is denied.

### 2. David J. Witz

 David J. Witz serves as the chief executive officer and managing director of

Fiduciary Risk Assessment LLC, which "provides consulting services, assessments of advisor

qualifications, white papers, development of ERISA 408(b)(2) compliance assessments, ERISA

3(21) and 3(38) survival kits, assistance with request for proposals ('RFPs'), benchmarking,

sales, marketing, coaching, concepts training, and expert witness services."  (Witz Report (Dkt.

No. 194-18) ¶¶ 1, 13)  The "target audience for [Fiduciary Risk Assessment's] services [is] individuals and entities serving as fiduciaries."  (Id. ¶ 13)

Witz started Fiduciary Risk Assessment in 2004, and "began developing software solutions to help fiduciaries ensure compliance with their duties under ERISA."  (Id. ¶ 12)  In 2009, Witz acquired PlanTools, which "became [Fiduciary Risk Assessment's] software platform for retail and custom fiduciary risk management solutions."  (Id.)  Fiduciary Risk Assessment "has created and distributes software tools and reports to investment advisors for thousands of defined contribution retirement plan investment fiduciaries that help the fiduciaries evaluate whether the investment options they offer to plan participants are performing adequately in light of their investment objectives and in comparison to other available investment options."  (Id. ¶ 6)

"As a consultant in the retirement and investment field, [Witz] routinely conduct[s] evaluations and assessments of fiduciary conduct under the ERISA standards, and provide[s] damage calculations as an expert when needed."  (Id.)  "As a CEO of a financial advisory company, [he] routinely consult[s] with fiduciaries on the construction of their investment menu, the analytics used to evaluate their investment menu, the design of their investment policy statement, and the design of their [c]harter."  (Id.)

Witz "ha[s] been working in the employee benefits investment field for over 38 years[,] [and] ha[s] provided independent fiduciary, recordkeeping, and consulting services in the retirement plans, securities, and insurance industries."  (Id. ¶ 7)  During those years, he "ha[s] been involved [in] . . . providing compliance information, consulting, and advice to plan sponsors, fiduciaries and service providers on investments and fiduciary related issues."  (Id.)

31

"In [his] work as a consultant and advisor to the retirement industry[,] [Witz] ha[s] read and ha[s] developed an understanding and familiarity with ERISA and the [Department of Labor]'s regulations, advisory opinions, field assistance bulletins, and other guidance for plan fiduciaries, as well numerous texts, articles, and other publications on ERISA's fiduciary standards."  (Id. ¶ 15)  He has "witnessed the fiduciary practices of numerous ERISA-governed plans, both those that fail ERISA's stringent standards and those that excel in meeting those standards."  (Id.)  "From all of this experience[,] [Witz] ha[s] personal knowledge and expertise both on the formal requirements of ERISA and the [Department of Labor], as well as the manner in which prudent and loyal fiduciaries can and do meet those stringent standards." (Id.)

In his report, Witz (1) "[r]eview[s] and evaluate[s] the objectives and fees of the Global Opportunity Fund"; (2) "[e]valuate[s] the performance of the [Global Opportunity] Fund compared to its objectives and compared to performance of the assigned benchmark and various market benchmarks"; (3) "[o]pine[s] on the recommendations and analysis that a typical investment advisor who is familiar with such matters would provide to the [Savings] Plan's fiduciaries regarding the Global Opportunity Fund"; and (4) "[o]pine[s] as to whether the [Global Opportunity] Fund . . . fulfilled the role it was designed to fulfill within the [Savings] Plan's portfolio."  (Id. ¶ 3)  In his report, Witz also provides background information concerning the Global Opportunity Fund (id. ¶¶ 20-27), sets forth a generally accepted monitoring process for such a fund (id. ¶¶ 28-37), and assesses the performance of the Global Opportunity Fund, using several metrics.  (Id. ¶¶ 38-48)

Witz concludes that "[t]he record is clear that the [Global Opportunity] Fund underperformed"; that "[i]t is also clear that both [Verizon Investment] and [the Benefits

Committee] knew or should have known of the [Global Opportunity] Fund's sub-par results using metrics and modes of analysis commonly used to analyze and monitor investments"; and that Verizon Investment and the Benefits Committee "failed to take action to remove the [Global Opportunity] Fund [as an investment option for Savings Plan participants]." (Id. ¶ 49) Witz further opines that, "[i]n light of the relevant information available to [Verizon Investment] and [the Benefits Committee] regarding the [Global Opportunity] Fund's sub-par performance and risks, there is no reason why the Global Opportunity Fund was not removed by the first quarter of 2010 at the latest." (Id. ¶ 50)

      Witz bases his opinions in part on his company's practice of "evaluat[ing] an investment's performance over a period of [seven] to [twelve] quarters as a baseline for identifying and removing underperforming managers." (Id. ¶ 35) Witz states that "it is rare that any of [his company's] clients continue offering a fund beyond [twelve] quarters of sub-par performance." (Id. ¶ 37)

      Defendants contend that "Witz has no relevant experience regarding investments similar to the [Global Opportunity] Fund," noting that "he has never managed a hedge fund, . . . advised a hedge fund, . . . provided any advice to a hedge fund[,] [or] . . . advised any plan that offered a hedge fund investment." (Def. Br. (Dkt. No. 174) at 14) Defendants further contend that "Witz not only lacks experience with hedge funds, but he also lacks experience with large complex plans that provide unique fund of fund investments rather than mutual funds." (Id. at 15)

      But Witz's opinions do not turn on the fact that the Global Opportunity Fund offered hedge fund investments or that the Global Opportunity Fund itself was a fund of fund investment option. The thrust of his opinions is far more general: at one point does the

underperformance of an investment option in an ERISA plan require the plan fiduciaries to remove that investment as an option for plan participants?  The record indicates that Witz has extensive experience as to this inquiry.

As discussed above, Witz has more than thirty-eight years of experience in the employment benefits investment field.  (Witz Report (Dkt. No. 194-18) ¶ 7)  Moreover, Witz created a company – Fiduciary Risk Assessment – that "has created and distributes software tools and reports to investment advisors for thousands of defined contribution retirement plan investment fiduciaries that help the fiduciaries evaluate whether the investment options they offer to plan participants are performing adequately in light of their investment objectives and in comparison to other available investment options."  (Id. ¶ 6)  And "[a]s a consultant in the retirement and investment field, [Witz] routinely conduct[s] evaluations and assessments of fiduciary conduct under the ERISA standards, and provide[s] damage calculations as an expert when needed."  (Id.)  "As a CEO of a financial advisory company, [he] routinely consult[s] with fiduciaries on the construction of their investment menu, the analytics used to evaluate their investment menu, the design of their investment policy statement, and the design of their [c]harter."  (Id.)

Witz's extensive and broad-based experience with thousands of ERISA fiduciaries managing defined contribution benefit plans, as well as his creation of software aimed at assisting ERISA fiduciaries in selecting appropriate investment options, provides him with an ample basis to opine on the issues before this Court.

Defendants argue, however, that Witz's methodology is unreliable, because he cites a common practice he has observed in his work, in which ERISA fiduciaries commonly replace funds after twelve quarters of underperformance.  (Def. Br. (Dkt. No. 174) at 12-15)

34

According to Defendants, Witz's reliance on this common practice is unsupported ipse dixit. (Id.)  "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between th[e] [expert's] methodology and the expert's conclusions," and courts are not required "'to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.'"  Nimely, 414 F.3d at 396 (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  Here, however, there is a sufficient analytical connection between Witz's twelve quarters of underperformance standard and his conclusion that "there is no reason why the Global Opportunity Fund was not removed by the first quarter of 2010 at the latest."  (Witz Report (Dkt. No. 194-18) ¶ 50)

Witz's twelve underperforming quarters standard and the opinions flowing from it are not mere ipse dixit.  Witz states that – over his thirty-eight-year career of advising ERISA plan fiduciaries – he has "seen thousands of fund replacements occur with less than [twelve] quarters of underperformance as standard protocol."  (Id.)  Witz further states that his company "evaluates an investment's performance over a period of [seven] to [twelve] quarters as a baseline for identifying and removing underperforming managers," and that "it is rare that any of [his company's] clients continue offering a fund beyond [twelve] quarters of sub-par performance."  (Id. ¶¶ 35, 37)  Witz observes that – after twelve quarters of underperformance between the Global Opportunity Fund's inception on January 1, 2007 and the end of 2009, the Global Opportunity Fund "did not add value versus the hurdle rate," "failed to meet or beat its benchmark on an annualized basis by the end of 2009," and "did not produce positive absolute returns regardless of market conditions over time as expected."  (Id. ¶ 49)  Given this history, Witz goes on to opine that "there is no reason why the Global Opportunity Fund was not

removed [from the Savings Plan's investment options] by the first quarter of 2010 at the latest."
(Id. ¶ 50)  Given Witz's explanation for his conclusion, his opinion is not ipse dixit.

While Defendants complain that Witz's twelve underperforming quarters standard
is not "'an absolute'" standard (Def. Br. (Dkt. No. 174) at 11 (quoting Taylor Decl., Ex. 2 ("Witz
Dep.") (Dkt. No. 175-2) at 9)), Witz's reliance on this standard does not render his opinions
inadmissible.  Witz states that his company routinely uses this standard for its clients, and that he
has "seen thousands of funds removed or replaced" using this standard.  (Witz Report (Dkt. No.
194-18) ¶¶ 35, 37, 50)  Given Witz's extensive experience in the field of advising ERISA plans
regarding investment options, the standard he cites is sufficiently reliable.  See Nimely, 414 F.3d
at 396 (citing Daubert, 509 U.S. at 593-94).

While Defendants argue that Witz's opinions are "contradictory and internally
inconsistent" (Def. Br. (Dkt. No. 174) at 11), this Court sees no evidence of such flaws.  And to
the extent that Defendants argue that Witz "'didn't say [the Global Opportunity Fund] should be
removed or would be removed in [his] report' based on any period of time" (id. (second
alteration in original) (quoting Witz Dep. (Dkt. No. 175-2) at 9)), that argument goes to the
weight that should be accorded to Witz's opinions, and not to their admissibility.  See Daubert,
509 U.S. at 596.  Moreover, Witz clearly expresses the view that – after 2009 – no logic
supported maintaining the Global Opportunity Fund as an investment option for Savings Plan
participants.  (Witz Report (Dkt. No. 194-18) ¶¶ 49-50)

Defendants also complain that Witz – in applying his twelve underperforming
quarters standard – "ignored the objective facts," including the Global Opportunity Fund's
"structure."  (Def. Br. (Dkt. No. 174) at 15-16)  Defendants contend that "Witz did not apply his
concocted twelve quarters rule to the underlying investments in the [Global Opportunity] Fund

or account for the fact that[,] rather than 'remove' the Fund as if it were a simple mutual fund, Verizon restructured the Fund to retain the best investments and eliminate[d] the Goldman Sachs [Offshore] investment that was not performing up to historical standards." (Id. at 16)  Contrary to Defendants' argument, however, Witz did not ignore objective facts – such as Defendants' repeated restructurings of the Global Opportunity Fund after the first quarter of 2010.  (See Def. R. 56.1 Stmt. (Dkt. No. 182) ¶¶ 230-33, 263, 268-69, 271, 276, 278, 290, 292, 294, 296)  These restructurings do not bear on Witz's opinion, because he concludes that the Global Opportunity Fund should have been replaced before the first quarter of 2010, after twelve quarters of underperformance.  (Witz Report (Dkt. No. 194-18) ¶ 50)

Defendants also complain that Witz's opinions will not be helpful to the factfinder because – apart from his conclusions – his report merely restates undisputed facts and provides calculations using figures already before the factfinder.  (Def. Br. (Dkt. No. 174) at 18-19) "Expert testimony is, however, admissible where it 'synthesizes' or 'summarizes' data in a manner that 'streamline[s] the presentation of that data to the [factfinder], saving the [factfinder] time and avoiding unnecessary confusion.'" Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 45 (S.D.N.Y. 2016) (first alteration in original) (quoting Louis Vuitton Malletier S.A. v. Sunny Merch. Corp., 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015)).  Here, Witz "[e]valuates the performance of the [Global Opportunity] Fund compared to its objectives and compared to performance of the assigned benchmark and various market benchmarks."  (Witz Report (Dkt. No. 194-18) ¶ 3(b))  Although the underlying facts concerning the Global Opportunity Fund's performance will be before the factfinder, Witz summarizes what the different metrics show when applied to the facts.  (See id. ¶¶ 44-48)  Accordingly, Witz's report streamlines the facts and would thus be helpful to the factfinder.

For all of these reasons, Defendants' motion to exclude Witz's opinions will be denied.

**B.      Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Claim that Defendants Breached Their Duty of Prudence Regarding the Global Opportunity Fund**

Defendants have moved for summary judgment on Plaintiff's claim that Defendants breached their duty of prudence with respect to the Savings Plan's target date funds and with respect to the Global Opportunity Fund. (Def. Br. (Dkt. No. 181) at 8, 13)

On September 28, 2017, this Court granted Defendants' motion to dismiss Plaintiff's fiduciary duty claim regarding the target date funds – the Complaint's First Claim for Relief (see Cmplt. (Dkt. No. 1) ¶¶ 114-23) – for failure to state a claim. (See Sept. 28, 2017 Order (Dkt. No. 70) at 9-14)  Accordingly, that claim is no longer before the Court.

The Court addresses below whether Plaintiff has offered evidence sufficient to raise a material issue of fact as to whether Defendants breached their duty of prudence with respect to the Global Opportunity Fund.

**1.      Applicable Law**

"'[T]he fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are those of trustees of an express trust – the highest known to the law.'"  Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006) (second alteration in original) (quoting Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).  "ERISA imposes 'a duty of care with respect to the management of existing trust funds, along with liability for breach of that duty, upon plan fiduciaries' who administer benefit-plan assets."  Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 709 (2d Cir. 2013) (quoting Lockheed Corp. v. Spink, 517 U.S. 882, 887 (1996)).  "In particular, ERISA requires

fiduciaries to use 'the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" Id. (quoting 29 U.S.C. § 1104(a)(1)(B)).

Consistent with this requirement, courts "'judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight.'" Id. at 716 (quoting In re Citigroup ERISA Litig., 662 F.3d 128, 140 (2d Cir. 2011), abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409 (2014)). Accordingly, courts "'cannot rely, after the fact, on the magnitude of the decrease in the [relevant investment's] price[, but] rather, . . . must consider the extent to which plan fiduciaries at a given point in time reasonably could have predicted the outcome that followed.'" Id. (first alteration in original) (quoting In re Citigroup ERISA Litig., 662 F.3d at 140). Rather, "[c]ourts evaluate the duty of prudence under an objective standard by considering 'a fiduciary's conduct in arriving at an investment decision, not on its results,' and asking 'whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.'" Cunningham v. Cornell Univ., No. 16 Civ. 6525 (PKC), 2019 WL 4735876, at *5 (S.D.N.Y. Sept. 27, 2019) (quoting St. Vincent, 712 F.3d at 716). The "prudent person" standard "requires that the fiduciary give 'appropriate consideration' to whether an investment 'is reasonably designed, as part of the portfolio . . . to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment.'" St. Vincent, 712 F.3d at 716 (omission in original) (quoting 29 C.F.R. § 2550.404a-1(b)(2)(i)). "Accordingly, the prudence of each investment is not assessed in isolation but, rather, as the investment relates to the portfolio as a whole." Id. at 716-17.

"An ERISA fiduciary's investment decisions . . . must[, however,] account for changed circumstances, and '[a] trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent.'" St. Vincent, 712 F.3d at 717 (second alteration in original) (quoting Armstrong v. LaSalle Bank Nat'l Ass'n, 446 F.3d 728, 734 (7th Cir. 2006)).  Accordingly, a trustee also has "a continuing duty to monitor trust investments and remove imprudent ones.  This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." Tibble v. Edison Int'l, 575 U.S. 523, 529 (2015).  "'[T]he trustee cannot assume that if investments are legal and proper for retention at the beginning of the trust, or when purchased, they will remain so indefinitely.' Rather, the trustee must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate." Id. (second and third alterations in original) (citation omitted) (quoting A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 145-48 (3d ed. 2009) (Bogert 3d)).  "[C]ourts must look . . . 'not only to [a fiduciary's] investigation procedures, but also to the methods used to carry out those procedures as well as the thoroughness of their analysis of the data collected in that investigation.'" Sacerdote v. New York Univ., 328 F. Supp. 3d 273, 284 (S.D.N.Y. 2018), aff'd, 9 F.4th 95 (2d Cir. 2021) (second alteration in original) (quoting Chao v. Tr. Fund Advisors, No. Civ. A. 02-559 (GK), 2004 WL 444029, at *3 (D.D.C. Jan. 20, 2004)).

In Cunningham v. Cornell University, for example, plaintiffs argued that defendants "imprudently selected and retained specific investment options including the TIAA Real Estate Account and CREF Stock Fund Account with high fees and poor performance relative to other readily available investment options based on underperformance of funds over one, five and ten-year periods."  2019 WL 4735876, at *11.

At summary judgment, the court began its analysis by noting that

> "[i]nvestment losses are not proof that an investor violated his duty of care." Long-term investment options, like those offered in a retirement plan, may have varying levels of performance over the course of time.  That is why it is not necessarily sufficient to show that at one point in time "better investment opportunities were available."

Id. (citations omitted) (quoting Jenkins v. Yager, 444 F.3d 916, 926 (7th Cir. 2006); St. Vincent, 712 F.3d at 718).

The court acknowledged, however, that "[p]erformance of a fund that '[falls] below . . . benchmarks established by plan documents' or 'some other metric or method used by prudent investors at the time' may signal an imprudent investment subject to additional review or monitoring."  Id. at *14 (omission and second alteration in original) (quoting St. Vincent, 712 F.3d at 722 n.20; citing Dardaganis v. Grace Cap. Inc., 889 F.2d 1237, 1241-42 (2d Cir. 1989); Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co., 259 F.3d 1036, 1042 (9th Cir. 2001)).

The court went on to grant defendants summary judgment on plaintiffs' claim that the defendants had breached the duty of prudence by not removing underperforming funds as investment options in certain ERISA retirement plans.  Id. at *15.  In reaching this conclusion, the court found that plaintiffs had not offered evidence that

(1) "other fiduciaries removed TIAA, CREF, or any other fund from their plan lineups based on the performance measures identified," noting that "99% of TIAA's 200 largest clients had a portion of their defined contribution plans' assets invested in the CREF fund and 84% in TIAA";

(2) "the benchmarks they cite to demonstrate underperformance in the August 2010 to July 2013 period would have been used by prudent fiduciaries at the time or would have led a prudent fiduciary to remove the funds from the plans' lineups";

(3) the Russell 3000 Index was a proper benchmark for the CREF fund, noting that "[e]ven plaintiffs' expert does not rely on the Russell 3000 Index as a proper benchmark for the CREF fund"; or

       (4) the Vanguard funds were a proper benchmark for the TIAA fund, noting that "plaintiff's expert analyzes TIAA's own benchmarks and those used by an investment advisor for a different university."

Id. at *12.

       The court also noted that defendants did not "'passively accept[]' the proposals provided by [their investment advisor]."  Id. at *14 (first alteration in original) (quoting In re Unisys Sav. Plan Litig., 74 F.3d 420, 435 (3d Cir. 1996); citing Donovan, 680 F.2d at 273). Rather, the record showed that the Oversight Committee reviewed the results of the funds at issue, considered investment alternatives, and

       "express[ed] concern" at the underperformance of CREF but decided to keep it, recognizing that the benchmark used by [its investment advisor] was "inadequa[te] . . . because there is no good benchmark for CREF stock" and recognizing a "legacy concern" given the large number of participants invested in the funds.

Id. at *14 (omission and first and third alterations in original).  The court noted that such "[e]vidence of 'discussions about the pros and cons' of investment alternatives is 'fatal to' plaintiffs' claims."  Id. (quoting Tibble v. Edison Int'l, 729 F.3d 1110, 1136 (9th Cir. 2013), vacated, 575 U.S. 523 (2015)).

       Finally, the Cunningham court noted that defendants' "independent investment advisor" had recommended that defendants "maintain TIAA and CREF in the investment plan['s] core lineups . . . 'as existing fund[s] or strong recommendations.'"  Id. at *13 (second alteration in original).

       In Cates v. Trs. of Columbia Univ. in City of New York, No. 16 Civ. 6524 (GBD) (SDA), 2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019), report and recommendation adopted, 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020), the court considered whether the fiduciaries for two ERISA retirement plans had breached their duty of prudence by continuing to offer the same two

funds at issue in <u>Cunningham</u> – the CREF Stock Account and the TIAA Real Estate Account –
"despite excessive fees and underperformance." <u>Id.</u> at *4.  In contrast to <u>Cunningham</u>, however,
the court denied the defendant's motion for summary judgment. <u>Id.</u> at *14.  Citing evidence that
investment advisers had informed the defendant that the CREF and TIAA funds at issue were not
meeting numerous investment guidelines; were subject to a sell rating; and should be terminated
as an investment option and added to a watch list for historical underperformance, respectively,
the court concluded that there were "genuine issues of material fact as to whether [the]
investments [at issue] were prudent." <u>Id.</u> at *13-14.

> ### 2.    Whether Plaintiff Has Offered Evidence that Creates a Material Issue of Fact as to Whether Defendants <u>Monitored the Global Opportunity Fund in a Prudent Manner</u>

Defendants contend that they are entitled to summary judgment because "[t]here
are no material facts in dispute regarding Verizon's process to develop and monitor the [Global
Opportunity] Fund[,] which included weekly, monthly, quarterly, and annual reviews, the
engagement of multiple preeminent fiduciaries, and the implementation of substantial changes to
the [Global Opportunity] Fund in response to market conditions."  (Def. Br. (Dkt. No. 181) at
13-14)  Defendants further argue that "[t]he undisputed facts show that the [Global Opportunity]
Fund performed well compared to similar hedge funds over the relevant time frame."  (<u>Id.</u> at 26)

The Court addresses below Defendants two-pronged argument in support of
summary judgment:  process and performance.

> #### a.    Whether Defendants' Process for Reviewing <u>Investment Options Justifies Summary Judgment</u>

Although Defendants' Rule 56.1 statement contains more than seventy-five
paragraphs describing its policies and procedures for reviewing the investment options offered to
Savings Plan participants – including review and analysis by the Benefits Committee, the

Executive Committee, and Verizon Investment, STAR reports, VIPER reports, and reports and analyses from investment advisers such as Rock Creek Group and Bridgewater (Def. R. 56.1 Stmt. (Dkt. No. 182) ¶¶ 150-228) – there is no evidence in these paragraphs that the "robust" and "rigorous questioning" that allegedly took place when Verizon Investment made presentations to the Benefits Committee and Executive Committee about the performance of investment options in the Savings Plan (id. ¶¶ 164, 166, 174-75) involved discussion of the Global Opportunity Fund in particular, or what any such discussion entailed.  There is likewise no evidence of what the STAR reports, the VIPER reports, the Rock Creek Group reports, and Bridgewater's reports – Defendants' primary tools for monitoring the performance of investment options – have to say about the merits of the Global Opportunity Fund, and why it should be maintained as an investment option in the face of disappointing performance, particularly with respect to its hurdle rate.  Similarly, there is no evidence showing what Verizon Investment's other advisors – CEM, Fidelity, Wilshire, Blackrock, and Towers Watson – said at the time about whether the Global Opportunity Fund should be maintained as a Savings Plan investment option, and if so, why.[5]

While "[a]ppointment of an independent investment advisor . . . provides 'evidence of a thorough investigation' and of '"procedural" prudence and proper monitoring,'" Cunningham, 2019 WL 4735876, at *13 (quoting DiFelice v. U.S. Airways, 497 F.3d 410, 421

---

[5]  Plaintiff asserts that Wilshire's March 2014 report to Verizon shows that the Global Opportunity Fund "'ranked in the [fourth] quartile,'" across the one-, three-, and five-year time periods.  (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶ 356 (quoting Bloom Decl., Ex. 23 – Part II (Dkt. No. 194-25) at 6))  Defendants respond by noting that Wilshire's report states that the Global Opportunity Fund "'falls into the Lipper category of "Global Flexible Portfolio Funds," which encompasses many multi-asset class funds but with varying allocations which may account for the lower quartile ranking.'"  (Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶ 356 (emphasis omitted) (quoting Bloom Decl., Ex. 23 – Part II (Dkt. No. 194-25) at 6))  Defendants otherwise do not address any report from a Verizon Investment advisor, and do not disclose what, if anything, any investment advisor said about whether the Global Opportunity Fund should be maintained as a Savings Plan investment option.

(4th Cir. 2007), the presence of a review process and an independent investment advisor does not have a talismanic effect.  An ERISA fiduciary seeking summary judgment on a lack of prudence claim must demonstrate that the investment option at issue was actually considered by the ERISA fiduciary and its investment advisors.  Similarly, while "[e]vidence of 'discussions about the pros and cons' of investment alternatives is 'fatal to' [a] plaintiff['s] claims," id. at *14 (quoting Tibble, 729 F.3d at 1136), the absence of any such analysis and consideration suggest that the policies and procedures in place may not have functioned as intended.

Here, Defendants provide no explanation as to why they preserved the Global Opportunity Fund as an investment option, and there is no evidence that, during the time period between the Global Opportunity Fund's inception on January 1, 2007 and April 1, 2010, the Benefits Committee or the Executive Committee discussed or considered what to do about the Fund's poor performance.

Beginning in early 2010, there is evidence that Verizon Investment began giving some attention to the Global Opportunity Fund.  According to Defendants, Verizon Investment internally reached a decision at that time to remove Goldman Sachs Offshore from the Global Opportunity Fund because of its poor performance.  (Def. R. 56.1 Stmt.  (Dkt. No. 182) ¶ 230) Before Defendants communicated that decision to Goldman Sachs, however, Goldman Sachs chose to close Goldman Sachs Offshore on its own.  (Id. ¶ 231)  Over the next seven years, Defendants tinkered with the structure of the Global Opportunity Fund, changing its investment management structure and its investment components.  (Id. ¶¶ 230-35, 263, 268-69, 271, 276, 278, 290, 292, 294, 296)  Ultimately, on February 1, 2017, the Benefits Committee eliminated the Global Opportunity Fund as an investment option.  (Id. ¶¶ 122, 297)  As discussed below, however, given the performance of the Global Opportunity Fund during the January 1, 2007 to

April 1, 2010 time period, there are material issues of fact as to whether the Global Opportunity Fund should have been eliminated as an investment option much earlier.  Indeed, Plaintiff has offered evidence that the Global Opportunity Fund should have been eliminated as an investment option in early 2010 "at the latest."  (Witz Report (Dkt. No. 194-18) ¶¶ 49-50)

In sum, although Verizon Investment maintains that it had a robust process in place to review Savings Plan investment options, it is not clear as a matter of law that this process functioned as designed, particularly in the January 1, 2007 to April 1, 2010 time period cited by Plaintiff.  Accordingly, Defendants are not entitled to summary judgment on this ground.

### b.  Whether Defendants Are Entitled to Summary Judgment Based on the Performance of the Global Opportunity Fund

Plaintiff has offered evidence that the Global Opportunity Fund performed poorly by several metrics between January 1, 2007 and December 31, 2009, and between January 1, 2007 and December 31, 2016.  Defendants dispute the applicability of the metrics Plaintiff cites, and contend that the Global Opportunity Fund performed well during these time periods.

In arguing that the Global Opportunity Fund suffered from sustained poor performance, Plaintiff's expert Jones cites the following metrics:  the Global Opportunity Fund's hurdle rate; the HFRI Fund Weighted Composite Index; the Sharpe Ratio and Information Ratio; and the CUSUM Alarms.

As to the hurdle rate, Plaintiff contends that – from inception on January 1, 2007 through December 31, 2009 – the Global Opportunity Fund underperformed by more than 20.0% in each of the first two years, and by 47.6% on a cumulative basis during that period.  (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶¶ 340-41)  Plaintiff further shows that, from inception through December 31, 2016, the Global Opportunity Fund underperformed its hurdle rate every year,

except 2010, and that, on a cumulative basis during that period, the Fund underperformed its

hurdle rate by 78.4%.  (Id. ¶¶ 340, 342)  While Defendants do not dispute Jones' calculations or

that the hurdle rate was the Global Opportunity Fund's benchmark, they contend that the "hurdle

rate is not a market benchmark."  (See Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶¶ 333, 337

("Defendants dispute this paragraph to the extent Plaintiff is claiming the hurdle rate was a

market benchmark.  Defendants do not dispute that the hurdle rate served as the Global

Opportunity Fund's 'benchmark,' but a hurdle rate is not a market benchmark."))

       Jones also compares the Global Opportunity Fund's performance with the HFRI

Fund Weighted Composite Index, however, which is a market benchmark.  She concludes that,

from the Global Opportunity Fund's inception on January 1, 2007 through December 31, 2009,

the Fund "underperformed the HFRI benchmark by approximately 22.7%," and "by more than

23.0%" for the ten-year period from the Fund's inception through December 31, 2016.  (Jones

Report (Dkt. No. 194-19) ¶ 29; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶¶ 350-52)  Plaintiff also

shows that the Global Opportunity Fund underperformed the HFRI benchmark in 2007, 2009,

2012, 2013, 2014, and 2016.  (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶ 352)

       While Defendants' expert Fischel opines that the HFRI Weighted Composite

Index is not an appropriate benchmark (see Fischel Rebuttal (Dkt. No. 194-60) ¶ 14 ("The

Global Opportunity Fund was not an investment that sought to replicate the performance of the

HFRI Fund Weighted Composite Index.  Further, the HFRI Fund Weighted Composite Index is a

global, equal-weighted index of single-manager hedge funds that report to HFR Database and,

thus, it includes the performance of many funds that are not absolute return investments.")), he

goes on to assert that "[t]he Global Opportunity Fund performed better [than the HFRI Fund

Weighted Composite Index] in a substantial fraction of the months."  (Id. ¶ 14; see id. at 20

(showing that "the Global Opportunity Fund's [r]eturn [e]xceeded the [r]eturn of" the HFRI Fund Weighted Composite Index in 44.4% of months between early January 2007 and December 31, 2009, and in 46.7% of the months between early January 2007 and December 31, 2016))

Plaintiff goes on to assert that "from inception through December 31, 2009 . . . , the Global Opportunity Fund significantly underperformed expectations, with a [three]-year annualized return of negative 4.2%," and "over the [ten]-year period from inception through December 2016, the Global Opportunity Fund's annualized return was just 1.4%."  (Jones Report (Dkt. No. 194-19) ¶ 27; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶¶ 363-65)  Defendants present similar data, asserting that the Global Opportunity Fund's net performance by the end of 2009 was -4.17%, and that the net performance over the ten-year life of the Fund was 1.4%.  (Def. R. 56.1 Stmt. (Dkt. No. 182) ¶ 72)

In addition to addressing absolute performance, Jones measures the Global Opportunity Fund's "investment risk," by calculating the Sharpe Ratio and Information Ratio. (Jones Report (Dkt. No. 194-19) ¶¶ 30-31; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶¶ 368-69) According to Plaintiff, the STAR reports show that, as of March 31, 2010, the Global Opportunity Fund's Sharpe Ratio and Information Ratio were -0.69 and -1.86, respectively, indicating that "the [Global Opportunity] Fund's return was below that of a risk-free asset, and that the Fund was not generating any excess return relative to its benchmark."  (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶ 373)  Similarly, Plaintiff's expert Witz states that the STAR reports show that, as of December 31, 2009, the Global Opportunity Fund's Sharpe Ratio and Information Ratio were -0.67 and -1.83, respectively.  (Witz Report (Dkt. No. 194-18) ¶ 43; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶ 375)

Defendants once again do not dispute these calculations.  They instead contend that the Sharpe Ratio and the Information Ratio are not proper measures of the Global Opportunity Fund's investment strategy, arguing that (1) "the Sharpe Ratio is only an appropriate way to evaluate a portfolio's performance when the portfolio is the investor's entire investment strategy," which the Global Opportunity Fund was not, and (2) "the performance of the Global Opportunity Fund cannot be evaluated using the Information Ratio because the hurdle rate is not a benchmark index."  (Fischel Rebuttal (Dkt. No. 194-60) ¶¶ 24, 27; Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶¶ 367-69, 372-73, 375-76)

Jones also cites to the CUSUM Alarms, which is "[a]nother measure of risk-adjusted performance."  (Jones Report (Dkt. No. 194-19) ¶ 35; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶ 386)  According to Defendants,

> The CUSUM Alarm calculation is a backward-looking sequential probability ratio test.  The alarm tracks changes in manager or fund performance relative to a designated benchmark, as calculated by the information ratio, over time.  The CUSUM Alarm calculation indicates monthly variances of a fund or manager relative to a threshold related to a predetermined benchmark.

(Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶ 386 (quoting Taylor Decl., 91 (Dkt. No. 190-91) ¶ 2)) According to Plaintiff, the CUSUM Alarm reports regarding the Global Opportunity Fund were "undesirable," indicating that the Fund and its investment manager "had a higher probability of underperforming the predetermined benchmark based on past performance."  (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶ 386)  Plaintiff further shows that – by the end of 2008 – the Global Opportunity Fund had registered four CUSUM Alarms.  (Id. ¶¶ 387-88)  Indeed, the Global Opportunity Fund triggered more CUSUM Alarms between 2008 and 2016 than any other Savings Plan investment option.  (Id.)

According to Defendants, a portfolio's beta "measures the systematic risk of the portfolio," with a beta less than one indicating that "the investment portfolio has less systematic

risk than the market portfolio," while a beta greater than one indicates that "the investment portfolio has more systematic risk than the market portfolio." (Fischel Report (Dkt. No. 190-274) ¶ 28 & n.47) Between 2010 and 2012, Verizon Investment reported to the Executive Committee that the Global Opportunity Fund had a beta ranging from 1799.31 to 2582.40. (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶ 381) Although Defendants point out that the STAR reports and Executive Committee materials in 2012 show lower betas – ranging from 1.33 to 3.13 (Def. Resp. R. 56.1 Stmt. (Dkt. No. 183) ¶ 381) – these betas are still greater than one, which indicates more systematic risk.

Based on these metrics, Witz opines that "there is no reason why the Global Opportunity Fund was not removed by the first quarter of 2010 at the latest." (Witz Report (Dkt. No. 194-18) ¶ 50; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 187) ¶ 454)

In sum, Plaintiff has offered substantial evidence that the Global Opportunity Fund underperformed several comparators by a substantial amount, during both the periods between the Fund's inception and the end of 2009, and between the Fund's inception and the end of 2016. To the extent that Defendants dispute Plaintiff's calculations and comparisons, they have shown merely material issues of fact, and not a right to judgment as a matter of law.

Although "'[i]nvestment losses [standing alone] are not proof that an investor violated his duty of care,'" Cunningham, 2019 WL 4735876, at *11 (quoting Jenkins, 444 F.3d at 926), as discussed above, there is no evidence that Defendants were engaged in a process to monitor the Global Opportunity Fund, or had a reason to maintain the Global Opportunity Fund as an investment option in the Savings Plan in light of its poor performance.

For all these reasons, Defendants' motion for summary judgment will be denied.

C.    **Motion to Strike Jury Demand**

Defendants have moved to strike Plaintiff's jury demand.  (Def. Mot. (Dkt. No. 171))  "Plaintiff does not oppose Defendants' motion."  (Pltf. Resp. (Dkt. No. 191) at 1)  Accordingly, Defendants' motion to strike Plaintiff's jury demand will be granted.

## CONCLUSION

Defendants' motion to strike portions of Plaintiff's summary judgment opposition papers (Dkt. No. 177) is granted as set forth above.  Defendants' motion to exclude Plaintiff's experts (Dkt. No. 173) is denied.  Defendants' motion for summary judgment (Dkt. No. 180) is denied.  Defendants' motion to strike Plaintiff's jury demand (Dkt. No. 171) is granted.  The Clerk of Court is directed to terminate the motions (Dkt. Nos. 171, 173, 177, and 180).

Trial in this matter will begin on **May 23, 2023, at 9:30 a.m.,** in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.  The parties' joint pretrial order and any motions in limine are due **May 2, 2023**, with responsive papers due on **May 9, 2023**.

Dated:  New York, New York
        April 20, 2023                          SO ORDERED.

_____
Paul G. Gardephe
United States District Judge